# EXHIBIT A

## DECLARATION OF MICHAEL S. MYERS

I, Michael S. Myers, verify as follows:

1.      I am an active member in good standing of the State Bar of Arizona and an associate with the law firm of Ballard Spahr LLP, counsel of record for Defendant Insys Therapeutics, Inc. ("Insys" or "Defendant").  I have firsthand knowledge of the matters set forth herein.  I submit this verification pursuant to L.R. Civ. P. 3.7 and Fed. R. Civ. P. 11.

2.      On October 15, 2018, paralegal Tasha Hart of my office and under my supervision, reviewed and printed the Superior Court docket.

3.      Attached as **Exhibit 1** is a true and correct copy of the Superior Court docket.

4.      Pursuant to 28 U.S.C. § 1446(a), **Exhibit 2** contains true and correct copies of all pleadings and other documents served on Insys or filed in the state court civil action original commenced in the Superior Court of the State of Arizona, in and for the County of Maricopa, entitled *Ramon Martin v. Insys Therapeutics, Inc.* (CV2018-011335).

5.      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of October, 2018.


                                        /s/ *Michael S. Myers*
                                        Michael S. Myers

# EXHIBIT 1

Skip To MainContent

[ Search ]

Civil Court Case Information - Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2018-011335 | Judge: | Whitten, Christopher |
| File Date: | 9/17/2018 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Ramon Martin | Plaintiff | Male | Sean O'Hara |
| Insys Therapeutics Inc | Defendant | | Michael Myers |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 10/12/2018 | NAR - Notice Of Appearance | 10/15/2018 | |
| **NOTE:** Notice of Appearance | | | |
| 10/12/2018 | STP - Stipulation | 10/15/2018 | |
| **NOTE:** Stipulation for Extension of Time to Respond to Complaint | | | |
| 9/24/2018 | AFS - Affidavit Of Service | 9/27/2018 | |
| 9/20/2018 | AFS - Affidavit Of Service | 9/25/2018 | |
| **NOTE:** INSYS THERAPEUTICS INC | | | |
| 9/20/2018 | SUM - Summons | 9/24/2018 | |
| 9/19/2018 | NOT - Notice | 9/20/2018 | |
| **NOTE:** Notice of Errata | | | |
| 9/17/2018 | COM - Complaint | 9/18/2018 | |
| 9/17/2018 | CCN - Cert Arbitration - Not Subject | 9/18/2018 | |
| 9/17/2018 | CSH - Coversheet | 9/18/2018 | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

# EXHIBIT 2

**In the Superior Court of the State of Arizona in and for the County of** Maricopa

CHRIS DEROSE, CLERK
BY DEP
T. HATCH, FIL

**CV2018-011335**

Is Interpreter Needed? ☐ Yes ☒ No
If yes, what language:

18 SEP 17 PM 4:57

Plaintiff's Attorney Sean J. O'Hara

Attorney Bar Number 024749

Plaintiff's Name(s): (List all)    Plaintiff's Address:    Phone #:    Email Address:
Ramon Martin, individually and on behalf of all others similarly situated

(List additional Plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)
Insys Therapeutics, Inc., a Delaware corporation

(List additional Defendants on page two and/or attach a separate sheet)

## NATURE OF ACTION

(Place an "X" next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐101 Non-Death/Personal Injury
☐102 Property Damage
☐103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐111 Negligence
☐112 Product Liability – Asbestos
☐112 Product Liability – Tobacco
☐112 Product Liability – Toxic/Other
☒113 Intentional Tort

☐114 Property Damage
☐115 Legal Malpractice
☐115 Malpractice – Other professional
☐117 Premises Liability
☐118 Slander/Libel/Defamation
☐116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐121 Physician M.D.   ☐123 Hospital
☐122 Physician D.O    ☐124 Other

**130 CONTRACTS:**

☐131 Account (Open or Stated)
☐132 Promissory Note
☐133 Foreclosure
☐138 Buyer-Plaintiff
☐139 Fraud
☐134 Other Contract (i.e. Breach of Contract)
☐135 Excess Proceeds-Sale
☐Construction Defects (Residential/Commercial)
  ☐136 Six to Nineteen Structures
  ☐137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 NCC-Employer Sanction Action
  (A.R.S. §23-212)

©Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
Page 1 of 2
CV10f – 070118

Case No._____

☐ 180 Injunction against Workplace Harassment
☐ 181 Injunction against Harassment
☐ 182 Civil Penalty
☐ 186 Water Rights (Not General Stream Adjudication)
☐ 187 Real Property
☐ Special Action against Lower Courts
   (See Lower Court Appeal cover sheet in Maricopa)
☐ 194 Immigration Enforcement Challenge
   (A.R.S. §§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL

☐ Administrative Review
   (See Lower Court Appeal cover sheet in Maricopa)
☐ 150 Tax Appeal
   (All other tax matters must be filed in the AZ Tax Court)
☐ 155 Declaratory Judgment
☐ 157 Habeas Corpus
☐ 184 Landlord Tenant Dispute- Other
☐ 190 Declaration of Factual Innocence
   (A.R.S. §12-771)

☐ 191 Declaration of Factual Improper Party Status
☐ 193 Vulnerable Adult (A.R.S. §46-451)
☐ 165 Tribal Judgment
☐ 167 Structured Settlement (A.R.S. §12-2901)
☐ 169 Attorney Conservatorships (State Bar)
☐ 170 Unauthorized Practice of Law (State Bar)
☐ 171 Out-of-State Deposition for Foreign Jurisdiction
☐ 172 Secure Attendance of Prisoner
☐ 173 Assurance of Discontinuance
☐ 174 In-State Deposition for Foreign Jurisdiction
☐ 176 Eminent Domain– Light Rail Only
☐ 177 Interpleader– Automobile Only
☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐ 183 Employment Dispute- Discrimination
☐ 185 Employment Dispute-Other
☐ 196 Verified Rule 45.2 Petition
☐ 195(a) Amendment of Marriage License
☐ 195(b) Amendment of Birth Certificate
☐ 163 Other _____
           (Specify)

## RULE 26.2 DISCOVERY TIER or AMOUNT PLEADED:
(State the amount in controversy pleaded or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.)

☐ Amount Pleaded $ _____   ☐ Tier 1   ☐ Tier 2   ☒ Tier 3

## EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order   ☐ Provisional Remedy   ☐ OSC   ☐ Election Challenge
☐ Employer Sanction   ☐ Other (Specify) _____

## COMMERCIAL COURT (Maricopa County Only)

☒ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the commercial Court. More information on the commercial Court, including the most recent forms, are available on the Court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

CHRIS DEROSE
Clerk of the Superior Court
By Ashley Hatch, Deputy
Date 09/17/2018 Time 17:01:55
Description                    Amount
--------- CASE# CV2018-011335 ----------
CIVIL NEW COMPLAINT            333.00
-----------------------------------------
TOTAL AMOUNT                   333.00
        Receipt# 26805247

1  Todd Feltus (#019076)
2  Sean J. O'Hara (#024749)
   KERCSMAR & FELTUS PLLC
3  7150 East Camelback Road, Suite 285
   Scottsdale, Arizona 85251
4  Telephone: (480) 421-1001
5  Facsimile: (480) 421-1002
   tfeltus@kflawaz.com
6  sjo@kflawaz.com

7  Attorneys for Plaintiff and the Putative Class

8

9          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

10             **IN AND FOR THE COUNTY OF MARICOPA**

11

12  Ramon Martin, individually and on behalf of       Case No. **CV2018-011335**
    all others similarly situated,
13                                                     **CLASS ACTION COMPLAINT**
                    Plaintiff,
14
15         v.

16  Insys Therapeutics, Inc., a Delaware
    corporation,
17
                    Defendant.
18

19

20

21

22

23

24

25

26

27

28

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................... 1

PARTIES ..................................................................................................... 3

JURISDICTION AND VENUE .................................................................... 3

FACTUAL ALLEGATIONS ........................................................................ 4

    A.     Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain. ......................................................................... 4

    B.     Insys Obtains FDA Approval to Sell and Market its Highly-Potent Fentanyl Product for a Single, Narrow Indication: The Management of Breakthrough Cancer Pain in Adult Opioid-Tolerant Patients ...................................................................... 5

    C.     Upon the FDA's Approval of Subsys, Insys Immediately Embarked Upon a Sophisticated, Multifaceted, and Purposeful Scheme to Expand Subsys's Off-Label Prescriptions-and Insys's Profits-Without Regard to the Law or Consumer Safety. ........................... 13

    D.     Arizona Purchasers of Health-Care Insurance Have Sustained Substantial Harm as a Result of All Defendants' Misconduct. .................. 23

    E.     Insys Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Its Actions. ............................ 27

FACTS SPECIFIC TO PLAINTIFF ............................................................ 28

CLASS ALLEGATIONS .............................................................................. 28

CAUSES OF ACTION ................................................................................. 31

    COUNT I: Violations of Arizona's Consumer Fraud Act, A.R.S. §§ 44-1521–34 ................................................................. 31

    COUNT II: Pattern of Unlawful Activity, A.R.S. § 13-2314.04 ..................... 32

    COUNT III: Public Nuisance, A.R.S. § 13-2917 ........................................... 33

    COUNT IV: Unjust Enrichment .................................................................... 35

    COUNT V: Negligence ................................................................................. 36

PRAYER FOR RELIEF ................................................................................ 37

Keosian & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

i

Plaintiff Ramon Martin ("Plaintiff") is a natural person and resident of Arizona. Plaintiff brings this Class Action Complaint ("Complaint") against Defendant Insys Therapeutics, Inc. ("Insys" or "Defendant") seeking redress for Defendant's alleged illegal acts that have caused Plaintiff's health insurance premiums to increase. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.      Prescription opioids have devastated communities across the country and in the State of Arizona. Since 1999, there have been more than 183,000 reported opioid-related deaths nationwide—more than three times the number of U.S. soldiers who died in the Vietnam War. In addition to the tragic loss of life and the heartbreaking impact on children and loved ones, some estimates state that the opioid crisis is costing governmental entities and private companies as much as $500 billion per year.

2.      Defendant Insys sells one of the most dangerous products on the market-Subsys.

3.      Subsys is an opioid-fentanyl drug approximately fifty times stronger than heroin and one hundred times more potent than morphine. It is part of a special class of drugs, known as transmucosal immediate release fentanyl ("TIRF"), which are approved by the Food and Drug Administration ("FDA") for the single use of managing breakthrough cancer pain in patients who are tolerant to around-the-clock opioid therapy.

4.      Cognizant that selling Subsys only in compliance with its FDA-approved label would not generate the substantial revenue that it desired, Insys devised a subversive and illegal plan to promote Subsys for uses beyond the sole, narrow indication for which it sought and received FDA approval.

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1

5.    Specifically, Insys (i) directed its sales force to push healthcare providers to write Subsys prescriptions for more patients and at higher doses to treat chronic pain of any type, despite the attendant dangers; (ii) paid those prescribers with among other things, sham speaking and consulting fees; and (iii) fraudulently induced insurers to pay for the off-label prescriptions, including by misrepresenting patients' diagnoses and treatment histories.

6.    The opioid epidemic is in part the direct result of the Defendant's deliberately crafted, well-funded campaign of deception. For years, it misrepresented the risks posed by the opioids it manufactures and sells, misleading susceptible prescribers and vulnerable patient populations. As families and communities suffered from the scourge of opioid abuse, the Defendant earned billions in profits as a direct result of the harms they imposed.

7.    The Defendant knew that its misrepresentations about the risks and benefits of its opioids were not supported by, and sometimes were directly contrary to, the scientific evidence.

8.    The explosion in opioid prescriptions and use has created a public health crisis in Arizona. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin. In addition to the societal impact of deaths, overdoses, and rampant addiction, Defendant's conduct has created higher demand and thus higher prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for Arizona residents.

9.    Defendant's conduct has fueled skyrocketing opioid addiction and opioid-related deaths and emergency treatments and has generated huge sales of opioids at inflated prices.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

2

10.     The direct and proximate consequence of Defendant's misconduct is that every Arizona purchaser of private health insurance paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Defendant and charged that back to insureds in the form of higher premiums, deductibles, and co-payments.

11.     This action seeks to hold Defendant accountable for the economic harm it has imposed on Arizona purchasers of private health insurance.

## PARTIES

12.     Plaintiff Ramon Martin is a natural person and resident and citizen of the State of Arizona.

13.     Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys manufactures, markets, sells and distributes Subsys—a sublingual spray of fentanyl—in Arizona and nationwide.

14.     At all relevant times, Defendant promoted, marketed, advertised, distributed and sold opioid products in the State of Arizona and to Arizona residents, citizens, and businesses.

## JURISDICTION AND VENUE

15.     The acts and events on which Plaintiff's claims are based primarily took place in Maricopa County, Arizona. Accordingly, this Court has jurisdiction over this matter under A.R.S. § 12-123, and venue is proper in this Court under A.R.S. § 12-401.

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

3

**FACTUAL ALLEGATIONS**

**A.    Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain.**

16.    Opioids are a class of chemical compounds that bind to opioid receptors in the human nervous system. Opioids elicit a euphoric response by stimulating pleasure centers in the brain. This euphoric response allows opioids to effectively mask pain, but it also causes the drugs to be highly addictive.

17.    Common opioids include morphine, methadone, oxycodone, hydrocodone, codeine, and fentanyl. These drugs cannot be lawfully obtained without a valid prescription. Common brand names for these drugs include Vicodin, Percocet, and OxyContin. Heroin is also classified as an opioid.

18.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for cases of acute pain, surgery recovery, cancer treatment, or end-of-life palliative care. There was widespread medical consensus that opioids should not be used to treat chronic pain due to the lack of evidence that opioids improved patients' ability to overcome pain, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other side effects.

19.    In the limited cases where patients were prescribed opioids, the drugs ordinarily were administered in closely supervised environments, like inpatient-treatment or hospice facilities, and typically only for short periods of time. These closely supervised conditions mitigated the risk that patients might misuse opioids, and they allowed doctors to monitor patients for signs of potential addiction or dependence.

20.    While these prevailing medical norms had strong scientific bases and reflected sound medical judgment, the Defendant viewed the medical community's hesitance to prescribe opioids as an impediment to substantial profits they could obtain from increased use of their opioid products. Thus, the Defendant devised a

Keesmaar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

4

scheme to misrepresent the risks and benefits of opioids to increase prescriptions by tapping into the large and lucrative market for chronic-pain patients.

**B.      Insys Obtains FDA Approval to Sell and Market its Highly-Potent Fentanyl Product for a Single, Narrow Indication: The Management of Breakthrough Cancer Pain in Adult Opioid-Tolerant Patients**

*1.      The Approval Process for a New Drug Application*

21.     Pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., a drug manufacturer, like Insys, may not sell and market a new drug unless that drug has been evaluated and approved by the FDA. *See generally* 21 U.S.C. § 355. The FDA may approve a drug if, among other things, it concludes that there are "adequate and well-controlled clinical trials" that demonstrate the drug's safety and efficacy for "the conditions of use prescribed, recommended, or suggested" in its proposed labeling, which the FDA must also review and approve. *See* 21 U.S.C. § 355(d). The required labeling includes, among other things, the drug's approved indication(s), dosages, "clinically significant adverse reactions," "other potential safety hazards," and "limitations in use imposed by them." *See* 21 C.F.R. § 201.57.

22.     As a precondition to, and ongoing requirement of, approval of a new drug application ("NDA"), the FDA may require the drug manufacturer to implement a "risk evaluation and mitigation strategy" ("REMS") if the FDA determines such a strategy "is necessary to ensure that the benefits of the drug outweigh the risks of the drug." 21 U.S.C. § 355-l(a)(l). As part of a REMS, the FDA may require that the drug manufacturer "develop for distribution [a Medication Guide] to each patient when the drug is dispensed," 21 U.S.C. § 355-l(e)(2), if it determines the drug "pose[s] a serious and significant public health concern requiring distribution of FDA-approved patient information," 21 C.F.R. § 208.1.

23.     Some drugs are more dangerous than others, and as such, may cause the FDA to impose additional restrictions as a condition of approval. For drugs deemed to have "inherent toxicity or potential harmfulness" and to be "associated

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

with a serious adverse drug experience," the FDA may require that a REMS include "elements as are necessary to assure safe use of the drug" to "mitigate a specific serious risk listed in [its] labeling[.]" 21 U.S.C. § 355-l(f)(l)(A). Such elements may include, without limitation, a requirement that "health care practitioners who prescribe the drug have particular training or experience, or are specially certified," that "the drug be dispensed to patients with evidence or other documentation of safe-use conditions," and that "each patient using the drug be subject to certain monitoring [or] be enrolled in a registry." 21 U.S.C. § 355-1(f)(3).

> 2. *The Prohibition Against Off-Label Marketing and the Making of False and Misleading Statements Regarding an FDA-Approved Drug.*

24. Following FDA approval of its NDA, a drug manufacturer, like Insys, may not market and promote the drug for a non-approved indication or in a manner inconsistent with the drug's FDA-approved labeling, and its marketing and promotional materials may not contain false or misleading statements about the drug. *See, e.g.*, 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. This restriction pertains to the clinical indications for which the FDA approved the drug, the dosing regimen that is supported by the clinical trials conducted to establish its safety and efficacy, as well as any other information appearing on the drug's approved labeling.

25. If a drug manufacturer, like Insys, believes that its FDA-approved drug should be sold, marketed, or otherwise promoted for indications different than those listed on its FDA- approved labeling, the law provides a way: the manufacturer must conduct additional "adequate and well-controlled clinical trials" to test the drug's safety and efficacy for the newly proposed indications, and file a supplemental NDA with the FDA. See 21 U.S.C. § 355(c)(5); 21 C.F.R. § 314.54.

26. Unless and until the FDA approves the drug for additional indications, any unapproved use is called "off-label," a term that refers to the use of an approved drug for an indication, or in any manner, other than what is described in the drug's approved labeling.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

27.     The above-mentioned restrictions on marketing, advertising, and false and misleading statements are in place to "protect the public health by ensuring that . . . drugs are safe and effective," 21 U.S.C. § 393(b)(2)(B), as well as guard against consumer abuse by profit-driven corporations, like Insys.

*3.     Subsys and the Highly-Potent "TIRF" Class of Fentanyl Drugs*

28.     TIRF medicines are formulations of fentanyl that deliver the drug nearly instantaneously to their users via the oral mucosa. At the time Insys submitted its March 4, 2011 NDA for Subsys, there were five available TIRF medications: Abstral (fentanyl sublingual tablet), Actiq and its generic equivalents (fentanyl citrate oral transmucosal lozenge), Fentora (fentanyl buccal tablet), Lazanda (fentanyl nasal spray), and Onsolis (fentanyl buccal soluble film).

29.     On January 4, 2012, the FDA approved Insys's NDA for Subsys, making it the sixth TIRF drug, and approved it for "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

30.     The FDA explained that the indication for all TIRF substances, including Subsys, is "narrow" for the following reasons:

> [T]he population identified has a specific need for a treatment to address cancer-associated breakthrough pain, which is characterized by a quick onset, often high severity, and relatively short duration. These formulations of fentanyl are designed to have a relatively rapid rise to [maximum concentration] and a relatively short duration of effect. Fentanyl is a very potent opioid that can cause respiratory depression in microgram quantities. For this reason, the indication also reflects the need for patients to be opioid-tolerant, a physiological state in which patients are more tolerant to the CNS [Central Nervous System] depression and respiratory depression associated with opioids.

31.     To "ensure the benefits of the drug outweigh the risks of misuse, abuse, addiction, overdose, and serious complications due to medication errors," the FDA concluded that the approval of Subsys demanded the implementation of a Risk Evaluation and Mitigation Strategy ("REMS").

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

32.    REMS is a drug safety program that the FDA can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks. REMS are designed to reinforce medication use behaviors and actions that support the safe use of that medication. While all medications have labeling that informs health care stakeholders about medication risks, only a few medications require a REMS.

33.    Because the FDA found that Subsys "poses a serious and significant public health concern," it mandated, as one element of the required REMS, the "distribution of a Medication Guide," which it deemed to be "necessary for patients' safe and effective use of Subsys." In so doing, the FDA concluded that Subsys "is a product for which patient labeling could help prevent serious adverse effects and that has serious risks (relative to benefits) of which patients should be made aware" because such information "could affect patients' decisions to use, or continue to use Subsys."

34.    Insys's proposed Subsys labeling, submitted as part of its NDA and approved by the FDA, contains repeated warnings about its dangers, as well as instructions that must be followed to ensure its safe use and to mitigate its risks. Specifically, for example, Subsys's Full Prescribing Information states, among other things, as follows:

> WARNING: RISK OF RESPIRATORY DEPRESSION, MEDICATION ERRORS, ABUSE POTENTIAL
>
> Respiratory Depression
>
> Fatal respiratory depression has occurred in patients treated with transmucosal immediate-release fentanyl products such as SUBSYS, including following use in opioid non-tolerant patients and improper dosing. The substitution of SUBSYS for any other fentanyl product may result in fatal overdose.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Medication Errors

> Substantial differences exist in the pharmacokinetic profile of SUBSYS compared to other fentanyl products that result in clinically important differences in the extent of absorption of fentanyl that could result in fatal overdose.

Abuse Potential

> SUBSYS contains fentanyl, an opioid agonist and a Schedule II controlled substance, with an abuse liability similar to other opioid analgesics. SUBSYS can be abused in a manner similar to other opioid agonists, legal or illicit. This should be considered when prescribing or dispensing SUBSYS in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse or diversion.

35. Subsys's label makes unequivocally clear the class of prescribers who could appropriately prescribe Subsys, and also establishes the only appropriate initial starting dose:

> SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

> As with all opioids, the safety of patients using such products is dependent on health care professionals prescribing them in strict conformity with their approved labeling with respect to patient selection, dosing, and proper conditions for use.

> The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg.

36. Subsys's label also warned that it is prohibited and highly dangerous to convert patients on a one-to-one dosage basis from other formulations of fentanyl:

> Important Information Regarding Prescribing and Dispensing

> **SUBSYS is not bioequivalent with other fentanyl products. Do not convert patients on a mcg per mcg basis from other fentanyl products.**

9

> **When dispensing, DO NOT substitute a SUBSYS prescription for any other fentanyl product.** Substantial differences exist in the pharmacokinetic profile of SUBSYS compared to other fentanyl products that result in clinically important differences in the rate and extent of absorption of fentanyl. **As a result of these differences, the substitution of the same dose of SUBSYS for the same dose of any other fentanyl products may result in a fatal overdose.**
>
> **There are no conversion directions available for patients on any other fentanyl products. (Note: This includes oral, transdermal, or parenteral formulations of fentanyl.) All patients should be titrated from the 100 mcg dose.** Titrate each patient individually to provide adequate analgesia while minimizing side effects.

(Emphases in original.)

37.    Reflecting the grave dangers Subsys poses to public health and safety, the FDA determined that Subsys could be approved "only if elements necessary to assure safe use are required as part of a REMS to mitigate the risks of misuse, abuse, addiction, overdose, and serious complications due to medication errors that are listed in the labeling." Such elements, the FDA found, "will help assure proper patient selection and dispensing of Subsys." (Emphases added.)

38.    The result was Insys's inclusion in the TIRF REMS Access Program ("TIRF REMS Access Program" or "Program")—a restricted distribution regulatory regime applicable to all TIRFs. As its name suggests, the Program governs the healthcare industry's access to TIRF drugs. All prescribers, pharmacies, distributors, and consumers seeking, respectively, to prescribe, dispense, distribute, and consume TTRFs must, by law, first enroll in the Program. To enroll, each must, among other things, acknowledge that TIRF drugs are available only through the Program and agree to comply with the Program's requirements.

39.    With regard specifically to prescribers and pharmacies, who, upon enrollment, are granted the power to prescribe and dispense, respectively, enrollment means, among other things, that they must successfully complete a "knowledge

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1  assessment" (a quiz consisting of eleven multiple-choice questions) and

2  acknowledge having read the Program's "Education Program for Prescribers and

3  Pharmacists," which states, among other things, as follows:

Appropriate Patient Selection

Indication

TIRF medicines are indicated only for the management of breakthrough pain in adult patients with cancer 18 years of age and older **who are already receiving and who are tolerant to regular opioid therapy for underlying persistent cancer pain.**

TIRF medicines are intended to be used only in the care of opioid-tolerant patients with cancer and only by healthcare professionals who are knowledgeable of, and skilled in, the use of Schedule II opioids to treat cancer pain.

Risk of Misuse, Abuse, Addiction, and Overdose

TIRF medicines contain fentanyl, an opioid agonist and Schedule II controlled substance. TIRF medicines can be abused in a manner similar to other opioid agonists, legal and illicit.

These risks should be considered when prescribing or dispensing TIRF medicines in situations where the prescriber or pharmacist is concerned about an increased risk of misuse, abuse, addiction, or overdose.

Risk factors for opioid abuse include:

A history of past or current alcohol or drug abuse

A history of psychiatric illness

A family history of illicit drug use or alcohol abuse[.]

(Emphases in original.)

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

40. On July 31, 2013, more than a year after Insys began to sell and market Subsys throughout the United States, the FDA approved a supplemental NDA submitted by Insys that slightly changed Subsys's labeling to reflect the following:

### Patients on Actiq

The initial dose of SUBSYS is always 100 mcg with the only exception of [sic] patients already using Actiq.

For patients being converted from Actiq, prescribers must use the Initial Dosing Recommendations for Patients on Actiq table below[.]

...

| Current ACTIQ Dose (mcg) | Initial SUBSYS Dose (mcg) |
|---|---|
| 200 | 100 mcg spray |
| 400 | 100 mcg spray |
| 600 | 200 mcg spray |
| 800 | 200 mcg spray |
| 1200 | 400 mcg spray |
| 1600 | 400 mcg spray |

### All Other Patients

Individually titrate SUBSYS to a dose that provides adequate analgesia and minimizes side effects. The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg. **When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product[.]

(Emphases in original.)

41. Upon the FDA's approval of Subsys, Insys issued a press release hailing Subsys as a novel and revolutionary drug for treating breakthrough cancer pain ("BTCP").

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

42.     Since its launch in March 2012, Subsys was, and remains, extremely expensive, especially as dosage strengths increase from 100 mcg to 1600 mcg. Every year since its launch, Insys has increased Subsys's prices. The chart below summarizes the cost of a 120-dose supply of Subsys at each available dosage as of the month and year indicated:

| Strength (mcg) | December 2012 | December 2013 | December 2014 | December 2015 |
|---|---|---|---|---|
| 100 | $2,830.08 | $3,350.40 | $3,960.98 | $4,336.80 |
| 200 | $3,577.20 | $4,232.40 | $5,002.82 | $5,478.00 |
| 400 | $5,192.88 | $6,144.00 | $7,263.43 | $7,953.60 |
| 600 | $6,742.56 | $7,977.60 | $9,430.67 | $10,326.00 |
| 800 | $8,302.80 | $9,828.00 | $11,617.56 | $12,721.20 |
| 1200 | $11,470.80 | $13,536.00 | $18,861.34 | $20,652.00 |
| 1600 | $14,638.80 | $17,275.20 | $23,235.12 | $25,442.40 |

**C.     Upon the FDA's Approval of Subsys, Insys Immediately Embarked Upon a Sophisticated, Multifaceted, and Purposeful Scheme to Expand Subsys's Off-Label Prescriptions-and Insys's Profits-Without Regard to the Law or Consumer Safety.**

43.     With deliberate disregard of the health, safety, and welfare of consumers to whom its highly-potent and dangerous opioid product would be prescribed, Insys aggressively sought to grow profits by illegally increasing Subsys's off-label use.

44.     Insys effectuated its scheme in three primary ways:

(a)     One, Insys marketed Subsys in direct contravention of its FDA-approved label, including for initial prescriptions above the allowed 100 mcg dosage and prescriptions to treat non-BTCP.

(b)     Two, Insys paid for prescriber loyalty and production through various methods, including a sham speaker program through which the it paid top Subsys prescribers millions of dollars in payments.

(c)     And three, Insys went to great lengths to ensure its off-label prescriptions would be paid for by insurance companies, including by

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

fraudulently misrepresenting patients' diagnoses and treatment histories.

*1.    Insys Employed a Sophisticated Approach to Market Subsys Off-Label.*

45.    From the outset, Insys knew that the calculated targeting of high-volume opioid prescribers was critical to Subsys's success and trained its sales force accordingly. In particular, Insys targeted certain high-volume opioid prescribers, particularly high-dose prescribers of Actiq (and its generics), which Insys knew was mostly prescribed to non-cancer patients. Insys devised and instituted a focused targeting strategy designed, with its incentive compensation structure and other marketing tactics described below, to promote the writing of Subsys prescriptions for off-label use.

46.    Throughout the course of its illicit scheme, for example, Insys routinely provided its sales force with "target lists" ranking by "deciles" healthcare providers, including dentists and podiatrists, who could write prescriptions for controlled dangerous substances. Using third-party data and myriad metrics, such as a potential prescriber's history of prescribing specific opioids, like Actiq or Fentora, or a certain class of opioids, like short acting and rapid acting opioids, Insys ranked each prescriber by likelihood of becoming a high-volume, high-dose (and, thus, more lucrative) Subsys prescriber.

47.    Contrary to its repeated public acknowledgments that appropriate targets of its marketing efforts would be oncologists, the target lists Insys provided to its sales force focused on high-decile opioid prescribers—not necessarily and, indeed, rarely, oncologists-with few, if any, BTCP patients. Indeed, Insys's express marketing strategy, upon launch, was to "focus efforts on" high-decile prescribers, and then, "secondarily" to "expand efforts to oncologists[.]"

48.    Insys's initial, pre-launch target lists underscore that strategy. For example, a "Hyper Target List" that Insys gave its sales force in May 2012,

contained "ROO [or Rapid Onset Opioids] targets" who would likely prescribe Subsys.

49.    Tellingly, it was not until more than a year after launch that Insys finally made some effort to target oncologists by hiring oncology-specific sales representatives ("SSPs") and creating oncology-specific target lists. Insys's actions, however, reveal that those efforts were secondary to its goal to push Subsys off-label.

50.    First, Insys employed thirty oncology-specific SSPs out of a total sales force that, at its peak, exceeded 250 SSPs.

51.    Second, Insys consistently noted internally that most oncologists were ranked in the first or second decile, placing them outside the class of practitioners Insys routinely told its sales force were the "Right Prescriber[s]."

52.    Indeed, Insys identified as an "issue" with its "oncology penetration" strategy that few oncologists, only two to three percent nationwide, prescribed ROOs, and most oncologists were reluctant to refer patients to pain doctors.

53.    After poor performance in the oncology market, Insys disbanded its small oncology sales force approximately two years after creating it.

54.    Insys knew, and, on information and belief, has always known, that exceptional Subsys sales could only be achieved by expanding the universe of patients prescribed Subsys beyond the BTCP patient population by (i) misleading healthcare providers and patients about the safety and efficacy of off-label use; and/or (ii) finding healthcare providers who cared less about patient safety than their own profits.

55.    According to the FDA-approved Subsys label and for the express purpose of protecting patient safety, patients must be started on Subsys at a 100 mcg dose and titrated to a dose that adequately relieves the patient's BTCP.

56.    This portion of the FDA-approved label negatively impacted Insys's profitability in two ways. First, as evidenced by Insys's internal communications,

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 785
Scottsdale, Arizona 85251
(480) 421-1001

1   Insys management quickly realized it would not have the same level of success
2   converting patients to long-term Subsys users if they started at 100 mcg, as opposed
3   to higher doses. Second, higher doses of Subsys are exponentially more expensive
4   and, therefore, much more profitable for Insys.

5      57.   Accordingly, under the direction of former CEO, Michael Babich
6   ("Babich"), and Vice President of Sales, Alec Burlakoff ("Burlakoff")–both of
7   whom have been criminally indicted by the U.S. Department of Justice on Insys-
8   related charges of racketeering conspiracy, mail fraud conspiracy, wire fraud
9   conspiracy, and conspiracy to violate the Anti-Kickback law–Insys employed several
10  strategies that proved highly effective, including the (i) "effective dose" strategy, (ii)
11  Subsys "Switch" program, and (iii) "Super Voucher" program.

12     58.   As part of Insys's off-label marketing scheme, Insys created and
13  disseminated to prescribers across the Nation-including in Arizona-several template
14  letters of medical necessity ("LMN") containing language it deemed sufficient to
15  secure insurance reimbursement for off-label Subsys prescriptions. As Insys came to
16  learn more about the prior authorization requirements for each insurer with whom it
17  regularly communicated, these template LMNs grew increasingly more sophisticated
18  and deceptive.

19     59.   The first LMN–which Insys referred to as the "generic LMN"–
20  contained language that purports to justify off-label Subsys prescribing for "severe
21  pain" and "breakthrough pain"; it does not, however, mention cancer at all.

22     60.   In or around the first half of 2013, in apparent recognition that an
23  insurer might seek a better written justification for the approval of off-label Subsys
24  prescriptions-specifically for treating non-cancer breakthrough pain, Insys created
25  and disseminated a more robust LMN, which it called the "strong LMN." The strong
26  LMN purported to provide medical evidence in support of off-label uses, but it was
27  replete with misleading and false information.

28

16

61.   For example, the strong LMN represented that "[t]he literature since 2007 shows a favorable safety profile [for Rapid Onset Opioids]," but omitted any reference to opioid-induced hyperalgesia or any of the other dangers, such as addiction, respiratory depression and death, attendant to the use of a TIRF, such as Subsys.

62.   The strong LMN also stated that "[a]rticles as well as recent studies which are peer reviewed are available by Lynn Webster, M.D. [sic] et al showing efficacy of a rapid onset opioids [sic] in non-cancer patients . . . ."

63.   Insys's use of these LMNs to secure insurance coverage for off-label Subsys prescriptions was pervasive. Indeed, these LMNs appear in medical records for patients residing in no fewer than ten states, including in Alabama, Arizona, California, Colorado, Connecticut, Florida, New Jersey, New York, Pennsylvania and Texas.

64.   Insys's strong LMN also stated that the doctor submitting the LMN "would expect this necessity [to take Subsys] to continue for a life-long period."

65.   Underscoring Insys's use of the strong LMN for off-label uses, Insys utilized a separate LMN, which it named the "Perfect Cancer LMN," to be used exclusively for on-label purposes, namely a 100 mcg dose for patients suffering from BTCP who were already receiving and who were tolerant to around-the-clock opioid therapy. Accordingly, the strong LMN served no purpose other than to facilitate Insys's deceptive promotion of Subsys off-label.

66.   To facilitate insurance coverage for off-label Subsys prescriptions, Insys created several iterations of what it called "Opt-In Forms". These forms also served to alleviate prescribers' frequently expressed concerns about the burdens of the prior authorization process, which Insys executives identified as a hurdle to securing increased Subsys prescriptions.

67.   At least one widely-used version of these forms contained a pre-printed list of thirteen possible diagnoses for Subsys, of which only one was cancer. The

17

other twelve were for non-FDA-approved indications, including "Chronic Pain Syndrome," "Dysphagia," and "Degeneration of cervical intervertebral disc/Degeneration of cervicothoracic intervertebral disc."

68.     In so doing, Insys misleadingly and deceptively represented to patients, insurers, and pharmacy benefit managers ("PBMs") that it was appropriate and acceptable to prescribe Subsys for those off-label purposes.

69.     For example, on February 27, 2013, top Insys executive Michael Gurry, emailed the entire sales team, enclosing a "completed" form that he deemed to be a good example of a completed 'opt in' form," which sales representatives could use to "coach HCP offices." The attached completed IRC form was for a non-cancer patient with chronic pain, a clear off-label indication for Subsys. Notably, perhaps aware of the inappropriateness of his email, Gurry attempted to recall it a few hours later.

70.     It was Insys's express intent that these forms be used specifically to obtain off- label Subsys prescriptions and, on information and belief, to mislead patients, insurers, and PBMs. And it worked: Insys received completed Opt-In forms on behalf of over 850 patients.

71.     In furtherance of its illicit off-label marketing scheme, Insys motivated its sales force to unscrupulously sell Subsys by any means necessary, including through its compensation structure, which was heavily weighted on commissions and rewarded the achievement of certain goals known to the company to increase off-label Subsys prescriptions.

72.     Indeed, Insys management took great pains to remind its sales force that "Higher Doses= Higher Payouts!" and "More Patients= More$$$!"

73.     And in an industry in which bonus compensation and aggressive management are not unique, in or around 2016, an outside consulting firm concluded that Insys's incentive compensation structure was troubling because it incentivized non-compliant behavior and was "way outside the norm."

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

18

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(180) 421-1001

74.     As recently as June 2016, in response to the consulting firm's findings, Insys Executive Vice President and former COO Daniel Brennan ("Brennan") emailed Kapoor to relay his serious concerns about Insys's "overall sales rep compensation" structure, as well as Insys's hiring of subpar pharmaceutical representatives. In particular, Brennan explained that Insys is "still creating an environment of non-compliance by paying a low base salary (barely above minimum wage) and then very high ratio of incentive pay as their overall comp."

75.     Indeed, as Brennan explained to Kapoor, the consulting firm's interviews of Insys's employees revealed that they themselves found that Insys's "compensation structure encouraged inappropriate behavior," which Brennan assumed to mean "off label promotion and quid pro quo behavior." In Brennan's words, "with a potent pain product like (Subsys) ha[s], it is dangerous to have so little previous pharma experience/training." Brennan "strongly recommended" a change in payment structure "that is more in line with industry standards and creates a more compliant-behaving sales organization (important given the scrutiny we have with DOJ and media coverage of our company-both affecting our reputation and trust with customers and our internal personnel)."

76.     After Kapoor forwarded Brennan's email to Insys Board Member Patrick Fourteau, Fourteau replied to Brennan by stating that he did "not like either the tone or the substance of [Brennan's] message."

77.     When Kapoor responded to Brennan's email the following day, he, among other things, attempted to shift the blame from Insys to Brennan: "To be entirely honest, I am a little concerned that your email directly follows on the heels of the recent termination discussions (and actions) related to your commercial team."

2.     *In Exchange for Off-Label and Continued Subsys Prescribing at High Doses, Insys Provided Kickbacks to Arizona Prescribers*

78.     To guarantee that healthcare providers continued to prescribe Subsys off-label to their patients at high doses, Insys paid them kickbacks. These payments,

1   which amounted to millions of dollars over the years, were disguised as bona fide

2   compensation for participation at sham Insys-organized and Insys-sponsored

3   "informational events" and for serving as consultants or advisors on sham Insys-

4   organized boards. Insys's payment of kickbacks to certain key healthcare providers

5   was central to its scheme, and as such, Insys devoted a substantial amount of its

6   budget to bribing them.

7         79.    The primary way Insys bribed Subsys prescribers was its so-called

8   "Insys Speaker Bureau" ("ISB"). The ISB was established shortly after Subsys's

9   market launch purportedly to "support [Insys's] marketed prescription drugs

10  products." According to an Insys-generated standard operating procedure document

11  from November 2012, "[s]peakers selected to participate in bureaus are responsible

12  for delivering INSYS Speaker Programs (ISPs), with the objective of educating and

13  informing healthcare professionals (HCPs) in the medical community about

14  marketed INSYS products in a fair and balanced manner." That document claimed

15  that an "HCP must never be engaged as a speaker in order to induce, influence, or

16  reward him or her for using any INSYS product."

17        80.    The reality, however, was far different. Contrary to the ISB's professed

18  purpose of "educating and informing healthcare professionals," Insys routinely

19  equated successful "speaker programs" or "ISPs" with a high "return on investment"

20  or "ROI." Moreover, as demonstrated by Insys's own documents, it intended that its

21  "speakers" would write Subsys prescriptions in exchange for more ISB events.

22        81.    For example, by email dated March 14, 2013, Burlakoff noted that the

23  only sales representatives to whom Insys should allocate "ISP funds" are those who

24  "get the most bang for their buck using our money." In that email, he griped that "I

25  am tired of giving money to reps whom [sic] produce zero return on investment" and

26  stated that "[t]hose whom [sic] do not produce ROI from programs should not be

27  spending our ISP dollars[.]"

28

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

82.     Similarly, Insys management regularly instructed its sales representatives to offer speaking engagements to the "docs" who show a "willingness to prescribe," which, as Serra explained to his sales force in August 2012, "is basically why we have jobs." Notably, in that same email, Serra expressly discouraged his sales representatives from targeting oncologists as possible speakers, instead instructing them to focus their efforts elsewhere because "[r]ight now there are way too many Pain Targets that need to prescribe."

83.     The next month, Burlakoff emailed the entire sales force, with a BCC to Kapoor, to reiterate this point: "If you cannot guarantee that [a speaker] program will yield positive results, the program should not take place." Burlakoff explained that "[t]hese programs have been offered to you as the #1 opportunity to grow your business" and reminded them that they "get paid to produce tangible results."

84.     Burlakoff proceeded to instruct the sales force on how to guarantee success of an ISP: "Your program will absolutely NEVER be successful if your speaker does not have at least 10 times more clinical experience than all of your attendees combined! If your speaker is not an expert with the utilization of Subsys in his or her clinical practice, then your speaker need not speak for Insys anymore."

85.     In a reply to a sales representative's response to this email, Burlakoff wrote: "Your local speaker should be your 'business partner'. You do not work for him, nor does he work for you. You are partners in this endeavor, if your speaker does not see it this way[,] then it is time to identify another speaker."

86.     Insys leadership's insistence on speakers with significant "clinical experience" had nothing to do with those speakers' ability to better educate speaker program attendees.

87.     When considered together with the conduct, statements, and expectations of other Insys executives and representatives, as well as the reality that most, if not all of the ISPs were shams in which no actual educational presentation was made, it becomes clear that Burlakoff's reference to "clinical experience" means

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

that a speaker's admission to the Speaker Bureau was, and remained, contingent upon the speaker's demonstration of loyalty to Insys by writing Subsys prescriptions.

88.   Insys's kickback scheme was highly effective in securing prescribers' continued writing of Subsys prescriptions.

### 3.   Insys Established an Internal Business Unit Charged With Fraudulently Inducing Insurers and PBMs to Pay for Off-Label Subsys Prescriptions.

89.   Because of Subsys's high cost, most consumers are not able to obtain it without insurance coverage. At all times relevant to this Complaint, Insys's financial success, therefore, depended upon approval of Subsys prior authorization requests, often a prerequisite to insurance coverage for any costly and dangerous medication or therapy.

90.   Initially, Insys encountered a significant obstacle to securing consistent insurance coverage for Subsys: Most third-party payers generally would not pay for Subsys unless, among other things, it was prescribed to manage BTCP. Because the population of BTCP patients is very small and, as Insys was well aware, comprised only a fraction of its prescriptions, Insys could not meet its lofty sales goals without facilitating insurance coverage approval for off-label Subsys prescriptions.

91.   Indeed, around eight months post-launch, only approximately thirty to thirty-three percent of all Subsys prescriptions had received prior authorization.

92.   Cognizant that this low number of successful Subsys prior authorizations threatened its business, Insys executives schemed to overcome this obstacle through the use of fraud, misrepresentations, and false pretenses.

93.   In or around November 2012, Insys established an in-house business unit comprised of so-called "prior authorization specialists," whose sole purpose was to "do whatever it takes" to secure insurance coverage approval for all Subsys prescriptions, particularly those written off-label.

94.   Insys, by and through this unit, initially known as the Insys Reimbursement Center ("IRC"), and later, as the Patient Services Center ("PSC"),

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

engaged in pervasive insurance fraud to ensure third-party payer approval of the off-label Subsys prescriptions that inevitably resulted from Insys's illegal conduct (as described above).

95.     When the IRC was first established, only twelve prescribers used it to obtain prior authorizations. Just over a year later, by December 2013, more than 950 prescribers nationwide had made use of the IRC's "services," and the IRC had secured approval for more than 90% of prior authorization requests that it processed.

96.     Insys, by and through the IRC, fraudulently induced insurers to pay for off-label Subsys prescriptions in three principal ways.

97.     First, Insys hid the existence of the IRC and misrepresented that prior authorization calls made by the IRC were coming from healthcare providers.

98.     Second, Insys falsely reported, both verbally and in writing, that patients had cancer and breakthrough cancer pain in order to secure authorization.

99.     Third, Insys created a pay structure for IRC staff that rewarded fraudulent behavior with substantial bonuses.

**D.     Arizona Purchasers of Health-Care Insurance Have Sustained Substantial Harm as a Result of All Defendants' Misconduct.**

100.    Health insurance is an individual or group policy that provides coverage for hospital, medical, surgical, and/or prescription drug benefits.

101.    The Manufacturer and Distributor Defendants' misconduct has increased Plaintiff's cost of private health insurance in Arizona.

102.    In 2014, Arizona residents paid more than $43 billion for healthcare, of which over $15 billion was spent on private health insurance. As is true throughout the country, health care costs in Arizona are increasing at a rate far above core inflation. From 1991 to 2014, Arizonans spent an average of 6.9% more per year on personal, health-care-related expenses.

103.    Insurance premiums—the fees paid to get and keep insurance—have risen at an even more alarming clip. From 2001 to 2014, Arizona enrollees in private

Keronsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

health insurance have spent 6.3% more per year, increasing the total amount spent per person from $1,932 in 2001 to $4,035 in 2014. The average Arizona family of four enrolled in private health insurance pays more than $16,000 per year to cover premiums, co-pays, and other health-care related expenses.

104.    Many Arizona employees obtain health insurance through an employer. Arizona's providers of group health care insurance include: Aetna Health Inc. and Aetna AARP Health Insurance, Assurant Health Insurance, Celtic Health Insurance, Cigna Health Insurance, National General Benefits Solutions, Humana, UnitedHealthCare, and Blue Cross Blue Shield of Arizona.

105.    Other Arizonans obtain individual health insurance. As elsewhere, Arizonans typically buy individual health insurance when they do not have access to an employer plan and do not qualify for public health insurance like Medicaid or Medicare. Arizona's providers of individual health insurance include: Aetna, Blue Cross Blue Shield of Arizona, Cigna Health and Life Insurance Company, Health Choice Insurance Co, Health Net Life Insurance Company, Health Net of Arizona, Human Health Plan, Inc., Meritus Health Partners, University of Arizona Health Plans.

106.    Group participants may pay all or part of the premium directly, or their employers may pay all or part of the premium directly. Individual purchasers (or members of their family) pay the entire premium directly. The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance starts to cover healthcare costs. A "co-pay" is a flat amount the insured pays per claim, such as a doctor visit or prescription. "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met. Deductibles and co-payments often are higher under individual plans.

107.    As a direct and proximate result of the conduct described herein, natural and corporate persons have sustained losses and injuries in the form of higher

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

premiums, deductibles, and co-payments/co-insurance. Health care insurers in Arizona have paid (and expect to continue to pay) substantial amounts for opioid prescriptions that would never have been prescribed and/or filled absent all Defendants' misconduct, and have also paid (and expect to continue to pay) substantial amounts for treatment of individuals who became addicted to opioids and/or who became addicted to heroin or other drugs because of opioid use. Many of those individuals who became addicted to opioids—or who became addicted to heroin or other drugs because of opioid use—would never have become addicted or even received access to opioids absent Defendants' conduct described herein. These insurers have also paid for numerous other costs proximately caused by all Defendants' conduct, including care for babies born addicted to opioids, emergency-room treatments, and other claims.

108.   Plaintiff purchasers of private health insurance have been damaged as a result of paying prices that are higher as a direct result of all Defendants' misconduct. Arizona health insurers are easily able to—and do—pass higher costs onto their insureds. Premiums in health-insurance markets do not reflect individual differences in costs, meaning that all insureds bear higher costs inflicted by the highest-risk insureds.

109.   In Arizona, as in most other states, insurers charge premiums based on assigned rate classes, a pool of insured individuals with similar health status. Because the premium charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone. This empirical reality makes economic sense. Insurers cannot know ex ante if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient. So insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future, opioid-related claims.

110.   This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients, in Arizona

and nationwide. In 2015, total annual per-patient charges (the costs of providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

111.   Thus, as the opioid crisis has barreled forward across the country and in Arizona, so has the pressure on insurance companies to raise premiums. Indeed, by one estimate, private insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, and upon information and belief by a comparable percentage in Arizona, with the brunt of this burden falling on those aged 19 to 35. This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans and Arizonans over this period. Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

112.   The costs that all Defendants' conduct inflicted on the insurance market cannot be and have not been confined to opioid users because of such risk pooling. Empirical evidence evaluated by leading economists confirms this common-sense conclusion. In addition, many of the costs that all Defendants have inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since Arizona is like "all states [that] have mandated certain benefits that must be included in the health insurance package of that state, most commonly for substance abuse." Jonathan Gruber and Helen Levy, (2009). The Evolution of Medical Spending Risk, J. OF ECON. PERSPECTIVES, 23(4), pp. 25-48, at 32.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

### E.    Insys Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Its Actions.

113.    When engaging in the conduct described herein, Insys acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of its actions.

114.    Insys knew and should have known about these harms that its unlawful and unfair business practices have caused and continue to cause in Arizona. Insys closely monitored its sales and the habits of prescribing doctors. Its sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. It knew—and, indeed, intended—that its misrepresentations would persuade doctors in Arizona to prescribe and patients in Arizona to use their opioids for off-label uses, including chronic pain.

115.    At all relevant times, Insys knew that the likely consequences of its actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in Arizona, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

116.    Despite this knowledge, Insys engaged in the conduct described herein for the purpose of obtaining millions of dollars in windfall profits, while destroying the lives of countless Arizonans.

117.    Insys's actions are not excused by the fact that its drug labels may have allowed or did not exclude the use of opioids for chronic pain. Indeed, Insys's misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

118.    Nor is Insys's causal role broken by the involvement of doctors. Insys' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. The Manufacturer Defendants also were able to harness and hijack what doctors wanted to believe—namely, that

1   opioids represented a means of relieving their patients' suffering and of practicing

2   medicine more compassionately.

3       119.   While insurance companies may refuse to cover ineffective or

4   dangerous treatments, they too were misled by Defendants' pervasive campaign to

5   convince the healthcare industry that opioids were effective and necessary for long-

6   term pain management. Insurers paid Defendants for the care ordered by patients'

7   doctors, as well as for the resulting costs of addiction: treatment, emergency-room

8   care, and other claims. Those costs were ultimately passed along to Plaintiff and all

9   Class Members.

10       120.   Insys's acts complained of herein were intentional, wanton, willful, and

11   guided by an evil hand and mind.  Accordingly, Plaintiff seeks an award of punitive

12   damages.

## FACTS SPECIFIC TO PLAINTIFF

13

14       121.   Plaintiff is a natural person and resident and citizen of the State of

15   Arizona.

16       122.   Since at least 2015, Plaintiff has purchased health insurance through

17   his employer.

18       123.   Plaintiff currently purchases health insurance from Health Net of

19   Arizona.

## CLASS ALLEGATIONS

20

21       124.   **Class Definition**: Plaintiff brings this action pursuant to Ariz. R. Civ.

22   P. 23(b)(2) and (3) on behalf of himself and a Class of similarly situated individuals,

23   defined as follows:

24       All persons (including natural persons and entities) who purchased

25       health insurance policies in Arizona from 1996 through the present;

26       and all persons who paid for any portion of employer-provided health

27       insurance from 1996 through the present.

28

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1   Excluded from the Class are: (1) any Judge or Commissioner presiding over

2   this action and members of their families; (2) Defendants, Defendants' subsidiaries,

3   parents, successors, predecessors, and any entity in which the Defendants or their

4   parents have a controlling interest and their current, former, purported, and alleged

5   employees, officers, and directors; (3) counsel for Plaintiff and Defendants; (4)

6   persons who properly execute and file a timely request for exclusion from the Class;

7   (5) the legal representatives, successors, or assigns of any such excluded persons;

8   and (6) all persons who have previously had claims similar to those alleged herein

9   finally adjudicated or who have released their claims against Defendant.

10   125.   **Numerosity**: The exact number of Class members is unknown to

11   Plaintiff at this time, but it is clear that individual joinder is impracticable. As of

12   2014, the Centers for Medicare and Medicaid Services estimated that almost four

13   million people in Arizona enrolled in private health insurance. Ultimately, the Class

14   members will be easily identified through third-party business records.

15   126.   **Commonality and Predominance**: There are many questions of law

16   and fact common to the claims of Plaintiff and the Class, and those questions

17   predominate over any questions that may affect individual Class members. Common

18   questions for the Class include, but are not necessarily limited to the following:

19   •   whether Defendant made material misrepresentations regarding the

20   benefits and risks of its products;

21   •   whether Defendant acted intentionally with respect to the foregoing;

22   •   whether Defendant was negligent in the distribution of its products;

23   •   whether Defendant acted in violation of state law;

24   •   whether the Class is entitled to restitution and/or disgorgement, in

25   addition to, or as a substitute for, damages under Arizona law; and

26   •   whether Plaintiff is entitled to damages and/or injunctive relief.

27   127.   **Typicality**: Plaintiff's claims are typical of the claims of all the other

28   Class members. Plaintiff and the Class members sustained substantially similar

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1   damages as a result of Defendant's uniform wrongful conduct, based upon the same

2   interactions that were made uniformly with Plaintiff and the public.

3       128.   **Adequate Representation**: Plaintiff will fairly and adequately

4   represent and protect the interests of the other Class members. Plaintiff has retained

5   counsel with substantial experience in prosecuting complex litigation and class

6   actions. Plaintiff and his counsel are committed to vigorously prosecuting this action

7   on behalf of the Class members and have the financial resources to do so. Neither

8   Plaintiff nor his counsel has any interest adverse to those of the other Class members.

9       129.   **Policies Generally Applicable to the Class**: Defendant has acted and

10  failed to act on grounds generally applicable to Plaintiff and the other Class

11  members, requiring the Court's imposition of uniform relief to ensure compatible

12  standards of conduct toward the Class.

13      130.   **Superiority**: This case is also appropriate for class certification

14  because class proceedings are superior to all other available methods for the fair and

15  efficient adjudication of this controversy as joinder of all parties is impracticable.

16  The damages suffered by individual Class members will likely be relatively small

17  compared to the burden and expense of individual prosecution of the complex

18  litigation necessitated by Defendant's actions. Thus, it would be virtually impossible

19  for individual Class members to obtain effective relief from Defendant's misconduct.

20  Even if Class members could sustain such individual litigation, it would still not be

21  preferable to a class action, because individual litigation would increase the delay

22  and expense to all parties due to the complex legal and factual controversies

23  presented in this Complaint. By contrast, a class action presents far fewer

24  management difficulties and provides the benefits of single adjudication, economies

25  of scale, and comprehensive supervision by a single Court. Economies of time,

26  effort, and expense will be fostered and uniformity of decisions ensured.

27      131.   Plaintiff reserves the right to revise the Class Definition and Class

28  Allegations based on further investigation, including facts learned in discovery.

30

## CAUSES OF ACTION

### COUNT I:
### Violations of Arizona's Consumer Fraud Act, A.R.S. §§ 44-1521–34
### (Against All Defendants)

132.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

133.   Plaintiff brings this Count on behalf of all members of the Class who are or have been residents of Arizona at any relevant time.

134.   Arizona's Consumer Fraud Act prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

135.   Defendant's business practices as described in this Complaint are deceptive, unconscionable, and violate Arizona law because the practices deceived doctors, insurers, and consumers in Arizona, led to the sale of opioids that should not have been sold, and thereby caused Plaintiff and Class Members to pay higher insurance premiums.

136.   Defendant knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false, misleading, deceptive and unconscionable. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Arizona doctors, who prescribed opioids based on the Defendant's deception, and insurers who purchased, or covered the costs for the purchase of, opioids for chronic pain.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

137.    The Defendant's fraudulent, unlawful, and/or deceptive activity alleged herein caused insurers to pay for ineffective and dangerous treatments, as well as the increased costs associated with opioid addiction. Those costs were passed on to Plaintiff and members of the Class in the form of increased insurance premiums.

138.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations described in this Complaint.

## COUNT II:
### Pattern of Unlawful Activity, A.R.S. § 13-2314.04
### (Against All Defendants)

139.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

140.    Plaintiff is a "person," and Class Members are "persons," under A.R.S. § 13-2314.04(A).

141.    The Defendants have engaged in a pattern of unlawful activity that has caused harm to Plaintiff and Class Members.

142.    Defendants have committed at least two or more acts of unlawful activity as defined by § 13-2301(D)(4). These acts include those set out in Paragraphs 43 through 99 above concerning the pattern of racketing activity, which are incorporated by reference.

143.    These acts are qualifying unlawful acts under at least A.R.S. § 13-2301(D)(4)(b)(xv) and (xx) because they involve the assertion of false claims, and a scheme or artifice to defraud.

144.    These false statements and unlawful acts by the Defendants all have a same or similar purpose in furthering opioid prescribing and increasing sales of opioids without regard to diversion, and functioned within a structure designed to effectuate the common purpose.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

32

145.     These false statements and unlawful acts also had the same victims (Plaintiff and Class Members) and results (causing Plaintiff and Class Members to be injured in their business or property in the form of increases in insurance premiums), as well as other similar characteristics.

146.     These unlawful acts are each related to each other. Defendants made these knowing and intentional misrepresentations for their own financial gain. These acts would have been deceptive to persons of ordinary prudence and comprehension.

147.     These acts were continuous and reflect defendants' regular way of conducting business over the time period described above.

148.     The purpose of this scheme by Defendants was their own financial gain.

149.     As a direct and proximate cause of this pattern of unlawful activity by Defendants and the actions of Defendants and their employees, under Defendants' control, Plaintiff and Class Members have sustained damages in an amount to be proven at trial.

150.     Plaintiff's and Class Members' damages were reasonably foreseeable to the Defendants and treble damages are appropriate.

151.     In addition, Plaintiff and Class Members are entitled to their reasonable attorneys' fees and costs as provided under A.R.S. §§ 13-2314.04(A), (D)(4).

## COUNT III:
### *Public Nuisance, A.R.S. § 13-2917*

### (Against All Defendants)

152.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

153.     Arizona law prohibits Defendants from causing "anything . . . injurious to health . . . that interferes with the comfortable enjoyment of life or property by an entire community or neighborhood or by a considerable number of persons."

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

154.   Each Defendant, acting individually and in concert, has created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in Arizona.

155.   The public nuisance is substantial and unreasonable. All Defendants' actions caused and continue to cause the public health epidemic described above, and that harm outweighs any offsetting benefit.

156.   The Manufacturer Defendants knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—i.e., the opioid epidemic. The Manufacturer Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Their actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain.

157.   The Distributor Defendants knew and should have known that the rampant diversion of opioids that they enabled would create or assist in the creation of the public nuisance—i.e., the opioid epidemic. The Distributor Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Their actions were, at the very least, a substantial factor in the widespread diversion of opioids throughout Arizona.

158.   Without all Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

159.   All Defendants' actions have increased the cost of insuring individuals, and Plaintiff and Class Members—who pay insurance premiums—are injured.

160.    The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by all Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

161.    Plaintiff requests an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from future violations of Arizona law.

## COUNT IV:
### Unjust Enrichment

### (Against All Defendants)

162.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

163.    To the detriment of Plaintiff and Class members, all Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

164.    All Defendants have voluntarily accepted and retained the inflated prices paid for their opioid products with full knowledge that they were not lawfully entitled to it.

165.    Plaintiff and Class members bear the costs of the benefits conveyed to all Defendants in the form of increased insurance premiums.

166.    Between Defendants and Plaintiff/Class members, it would be unjust for Defendants to retain the benefits attained by their wrongful actions.

167.    All Defendants have been unjustly enriched, in the form of inflated prices, at the expense of Plaintiff and Class members who are entitled in equity to disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court, and any other relief the Court deems just and proper to remedy Defendants' unjust enrichment.

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

## COUNT V:
### Negligence

### (Against All Defendants)

168.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

169.   Each Defendant has a duty to exercise reasonable care in manufacturing and distributing highly dangerous medications in the State of Arizona.

170.   Defendants owe that duty to Plaintiff and Class Members. Defendants' profits as manufacturers and distributors are inextricably bound with the industry of health insurance, and any reasonably prudent manufacturer is aware of the basic mechanics of the insurance industry by which costs are passed on to others in a risk pool through premiums.

171.   The Manufacturer Defendants knew and should have known that misleading doctors and insurers about the safety and efficacy of opioids for long-term pain treatment would cause significant costs, not just to those for whom opioids were an ineffective and dangerous treatment, but to insurers that absorb healthcare costs, and thus ultimately to insurance customers. Similarly, the Distributor Defendants knew and should have known that allowing diversion of opioids would cause significant costs to consumers, insurers, and insurance customers.

172.   The Manufacturer Defendants breached their duty to Plaintiff and Class Members through their false and misleading promotion of opioids and their deceptive marketing scheme, misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

173.   The Distributor Defendants breached their duty to Plaintiff and Class Members to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks, as well as through their failure to comply with Arizona and federal laws protecting against diversion of controlled substances.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

174. All Defendants' conduct caused opioids to become widely available and widely used, and Defendants' actions were, at the very least, a substantial factor in the widespread abuse of opioids. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

175. As described above, Defendants' breach caused and proximately caused damages to Plaintiff and Class Members.

## PRAYER FOR RELIEF

176. Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

A. Declaring that the claims brought by Plaintiff may be maintained as a class action;

B. Declaring that Defendants have engaged in unlawful, fraudulent, deceptive, and unconscionable business acts and practices in violation of the Arizona Consumer Fraud Act;

C. Ordering Defendants to pay restitution of any money acquired by their unlawful, fraudulent, deceptive, and unconscionable business practices;

D. Declaring that Defendants have created a public nuisance and enjoining Defendants to abate the public nuisance that they created.

E. Declaring that Defendants have been unjustly enriched by their conduct;

F. Ordering Defendants to pay restitution of all benefits and disgorge all profits unjustly retained by Defendants;

G. Declaring that Defendants have acted negligently;

H. Ordering Defendants to pay all damages caused to Plaintiff and Class Members by their negligent actions;

I. Awarding treble and punitive damages as appropriate;

J. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

K. Awarding Plaintiff and the members of the Class their reasonable litigation expenses and attorneys' fees;

L. Awarding Plaintiff and the members of the Class pre- and post-judgment interest, to the extent allowable; and

M. Awarding such other and further relief as equity and justice may require.

DATED this 17th day of September, 2018.

KERCSMAR & FELTUS PLLC

By: _____

Todd Feltus
Sean J. O'Hara
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251

William S. Consovoy*
Thomas R. McCarthy*
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Michael H. Park*
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: 212.247.8006

Ashley Keller*
Travis Lenkner*
Seth Meyer*
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 2570
Chicago, Illinois 60606
Tel: 312.741.5220

*Pro Hac Vice admission to be sought

Attorneys for Plaintiff and the Putative Class

CHRIS DEROSE, CLERK
BY                    DEP
J. HATCH, FIL

18 SEP 17 PM 4:59

1  Todd Feltus (#019076)
2  Sean J. O'Hara (#024749)
   KERCSMAR & FELTUS PLLC
3  7150 East Camelback Road, Suite 285
   Scottsdale, Arizona 85251
4  Telephone: (480) 421-1001
5  Facsimile: (480) 421-1002
   tfeltus@kflawaz.com
6  sjo@kflawaz.com

7  Attorneys for Plaintiff and the Putative Class

8

9          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

10            IN AND FOR THE COUNTY OF MARICOPA

11

12  Ramon Martin, individually and on behalf of    Case No.   CV2018-011335
    all others similarly situated,
13                                                 CERTIFICATE RE COMPULSORY
14                          Plaintiff,             ARBITRATION

15       v.

16  Insys Therapeutics, Inc., a Delaware
    corporation,
17
                            Defendant.
18

19          The undersigned certifies that he knows the dollar limits and any other

20  limitations set forth by the local rules of practice for the applicable superior court,

21  and further certifies that this action **is not** subject to compulsory arbitration, as

22  provided in Rules 72 through 77 of the Arizona Rules of Civil Procedure.

23

24

25

26

27

28

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1    DATED this 17th day of September, 2018.

2

3              KERCSMAR & FELTUS PLLC

4            By:

5              Todd Feltus
                Sean J. O'Hara

6              7150 East Camelback Road, Suite 285
                Scottsdale, Arizona 85251

7

8              William S. Consovoy*
                Thomas R. McCarthy*

9              CONSOVOY MCCARTHY PARK PLLC
                3033 Wilson Boulevard, Suite 700

10             Arlington, Virginia 22201

11             Tel: 703.243.9423

12             Michael H. Park*

13             CONSOVOY MCCARTHY PARK PLLC
                745 Fifth Avenue, Suite 500

14             New York, New York 10151

15             Tel: 212.247.8006

16             Ashley Keller*
                Travis Lenkner*

17             Seth Meyer*

18             KELLER LENKNER LLC
                150 N. Riverside Plaza, Suite 2570

19             Chicago, Illinois 60606
                Tel: 312.741.5220

20

21             *Pro Hac Vice* admission to be sought

22             *Attorneys for Plaintiff and the Putative Class*

23

24

25

26

27

28

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Chris DeRose, Clerk of Court
*** Electronically Filed ***
M. Cain, Deputy
9/19/2018 12:45:00 PM
Filing ID 9720307

Todd Feltus (#019076)
Sean J. O'Hara (#024749)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
tfeltus@kflawaz.com
sjo@kflawaz.com

Attorneys for Plaintiff and the Putative Class

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| Ramon Martin, individually and on behalf of all others similarly situated, | Case No. CV2018-011335 |
| Plaintiff, | **NOTICE OF ERRATA** |
| v. | |
| Insys Therapeutics, Inc., a Delaware corporation, | |
| Defendant. | |

Plaintiff Ramon Martin files this notice of errata to correct an erroneously filed version of the complaint. Due to oversight, an earlier and incomplete draft of the complaint was filed. The correct draft of the complaint is attached as Exhibit A. For clarity, Exhibit A is dated the same as the original filing.

1    DATED this 19th day of September, 2018.

2

3                              KERCSMAR & FELTUS PLLC

4              By: */s/ Sean J. O'Hara*
                   _____
5                  Todd Feltus
                   Sean J. O'Hara
6                  7150 East Camelback Road, Suite 285
                   Scottsdale, Arizona 85251
7

8                  William S. Consovoy*
                   Thomas R. McCarthy*
9                  CONSOVOY MCCARTHY PARK PLLC
                   3033 Wilson Boulevard, Suite 700
10                 Arlington, Virginia 22201
                   Tel: 703.243.9423
11

12                 Michael H. Park*
                   CONSOVOY MCCARTHY PARK PLLC
13                 745 Fifth Avenue, Suite 500
                   New York, New York 10151
14                 Tel: 212.247.8006

15

16                 Ashley Keller*
                   Travis Lenkner*
17                 Seth Meyer*
                   KELLER LENKNER LLC
18                 150 N. Riverside Plaza, Suite 2570
                   Chicago, Illinois 60606
19                 Tel: 312.741.5220

20

21                 *Pro Hac Vice* admission to be sought

22                 *Attorneys for Plaintiff and the Putative Class*

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I certify that on September 19, 2018, I filed this document with the Clerk of the Court using TurboCourt, and in accordance with Supreme Court Administrative Order No. 2014-23, and served a copy through hand-delivery on the following:

Insys Therapeutics, Inc.
c/o CT Corporation System
3800 N. Central Avenue
Ste. 460
Phoenix, AZ 85012

*Defendant*


*/s/ Patricia S. Werner*

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

# EXHIBIT A



Todd Feltus (#019076)
Sean J. O'Hara (#024749)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
tfeltus@kflawaz.com
sjo@kflawaz.com

Attorneys for Plaintiff and the Putative Class

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Ramon Martin, individually and on behalf of all others similarly situated, | Case No. CV2018-011335 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| Insys Therapeutics, Inc., a Delaware corporation, | |
| Defendant. | |

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................1

PARTIES .........................................................................................................................3

JURISDICTION AND VENUE......................................................................................3

FACTUAL ALLEGATIONS ..........................................................................................4

    A.    Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain. ................................................................................4

    B.    Insys Obtains FDA Approval to Sell and Market its Highly-Potent Fentanyl Product for a Single, Narrow Indication: The Management of Breakthrough Cancer Pain in Adult Opioid-Tolerant Patients ......................................................5

    C.    Upon the FDA's Approval of Subsys, Insys Immediately Embarked Upon a Sophisticated, Multifaceted, and Purposeful Scheme to Expand Subsys's Off-Label Prescriptions-and Insys's Profits-Without Regard to the Law or Consumer Safety. ...........................13

    D.    Arizona Purchasers of Health-Care Insurance Have Sustained Substantial Harm as a Result of Defendant's Misconduct. ........................23

    E.    Insys Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Its Actions.............................27

FACTS SPECIFIC TO PLAINTIFF ............................................................................28

CLASS ALLEGATIONS ..............................................................................................28

CAUSES OF ACTION ..................................................................................................31

    COUNT I: Violations of Arizona's Consumer Fraud Act, A.R.S. §§ 44-1521–34 ..............................................................................31

    COUNT II: Pattern of Unlawful Activity, A.R.S. § 13-2314.04 ...........................32

    COUNT III: Public Nuisance, A.R.S. § 13-2917 ..................................................33

    COUNT IV: Unjust Enrichment.............................................................................34

    COUNT V: Negligence ...........................................................................................35

PRAYER FOR RELIEF ...............................................................................................36

i

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Plaintiff Ramon Martin ("Plaintiff") is a natural person and resident of Arizona. Plaintiff brings this Class Action Complaint ("Complaint") against Defendant Insys Therapeutics, Inc. ("Insys" or "Defendant") seeking redress for Defendant's alleged illegal acts that have caused Plaintiff's health insurance premiums to increase. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.      Prescription opioids have devastated communities across the country and in the State of Arizona. Since 1999, there have been more than 183,000 reported opioid-related deaths nationwide—more than three times the number of U.S. soldiers who died in the Vietnam War. In addition to the tragic loss of life and the heartbreaking impact on children and loved ones, some estimates state that the opioid crisis is costing governmental entities and private companies as much as $500 billion per year.

2.      Defendant Insys sells one of the most dangerous products on the market-Subsys.

3.      Subsys is an opioid-fentanyl drug approximately fifty times stronger than heroin and one hundred times more potent than morphine. It is part of a special class of drugs, known as transmucosal immediate release fentanyl ("TIRF"), which are approved by the Food and Drug Administration ("FDA") for the single use of managing breakthrough cancer pain in patients who are tolerant to around-the-clock opioid therapy.

4.      Cognizant that selling Subsys only in compliance with its FDA-approved label would not generate the substantial revenue that it desired, Insys devised a subversive and illegal plan to promote Subsys for uses beyond the sole, narrow indication for which it sought and received FDA approval.

1

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

5.     Specifically, Insys (i) directed its sales force to push healthcare providers to write Subsys prescriptions for more patients and at higher doses to treat chronic pain of any type, despite the attendant dangers; (ii) paid those prescribers with among other things, sham speaking and consulting fees; and (iii) fraudulently induced insurers to pay for the off-label prescriptions, including by misrepresenting patients' diagnoses and treatment histories.

6.     The opioid epidemic is in part the direct result of the Defendant's deliberately crafted, well-funded campaign of deception. For years, it misrepresented the risks posed by the opioids it manufactures and sells, misleading susceptible prescribers and vulnerable patient populations. As families and communities suffered from the scourge of opioid abuse, the Defendant earned billions in profits as a direct result of the harms they imposed.

7.     The Defendant knew that its misrepresentations about the risks and benefits of its opioids were not supported by, and sometimes were directly contrary to, the scientific evidence.

8.     The explosion in opioid prescriptions and use has created a public health crisis in Arizona. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin. In addition to the societal impact of deaths, overdoses, and rampant addiction, Defendant's conduct has created higher demand and thus higher prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for Arizona residents.

9.     Defendant's conduct has fueled skyrocketing opioid addiction and opioid-related deaths and emergency treatments and has generated huge sales of opioids at inflated prices.

10.     The direct and proximate consequence of Defendant's misconduct is that every Arizona purchaser of private health insurance paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Defendant and charged that back to insureds in the form of higher premiums, deductibles, and co-payments.

11.      This action seeks to hold Defendant accountable for the economic harm it has imposed on Arizona purchasers of private health insurance.

## PARTIES

12.     Plaintiff Ramon Martin is a natural person and resident and citizen of the State of Arizona.

13.     Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys manufactures, markets, sells and distributes Subsys—a sublingual spray of fentanyl—in Arizona and nationwide.

14.     At all relevant times, Defendant promoted, marketed, advertised, distributed and sold opioid products in the State of Arizona and to Arizona residents, citizens, and businesses.

## JURISDICTION AND VENUE

15.     The acts and events on which Plaintiff's claims are based primarily took place in Maricopa County, Arizona. Accordingly, this Court has jurisdiction over this matter under A.R.S. § 12-123, and venue is proper in this Court under A.R.S. § 12-401.

### **FACTUAL ALLEGATIONS**

**A.      Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain.**

16.     Opioids are a class of chemical compounds that bind to opioid receptors in the human nervous system. Opioids elicit a euphoric response by stimulating pleasure centers in the brain. This euphoric response allows opioids to effectively mask pain, but it also causes the drugs to be highly addictive.

17.     Common opioids include morphine, methadone, oxycodone, hydrocodone, codeine, and fentanyl. These drugs cannot be lawfully obtained without a valid prescription. Common brand names for these drugs include Vicodin, Percocet, and OxyContin. Heroin is also classified as an opioid.

18.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for cases of acute pain, surgery recovery, cancer treatment, or end-of-life palliative care. There was widespread medical consensus that opioids should not be used to treat chronic pain due to the lack of evidence that opioids improved patients' ability to overcome pain, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other side effects.

19.     In the limited cases where patients were prescribed opioids, the drugs ordinarily were administered in closely supervised environments, like inpatient-treatment or hospice facilities, and typically only for short periods of time. These closely supervised conditions mitigated the risk that patients might misuse opioids, and they allowed doctors to monitor patients for signs of potential addiction or dependence.

20.     While these prevailing medical norms had strong scientific bases and reflected sound medical judgment, the Defendant viewed the medical community's hesitance to prescribe opioids as an impediment to substantial profits they could obtain from increased use of their opioid products. Thus, the Defendant devised a

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

4

scheme to misrepresent the risks and benefits of opioids to increase prescriptions by tapping into the large and lucrative market for chronic-pain patients.

**B.    Insys Obtains FDA Approval to Sell and Market its Highly-Potent Fentanyl Product for a Single, Narrow Indication: The Management of Breakthrough Cancer Pain in Adult Opioid-Tolerant Patients**

*1.    The Approval Process for a New Drug Application*

21.    Pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., a drug manufacturer, like Insys, may not sell and market a new drug unless that drug has been evaluated and approved by the FDA. *See generally* 21 U.S.C. § 355. The FDA may approve a drug if, among other things, it concludes that there are "adequate and well-controlled clinical trials" that demonstrate the drug's safety and efficacy for "the conditions of use prescribed, recommended, or suggested" in its proposed labeling, which the FDA must also review and approve. *See* 21 U.S.C. § 355(d). The required labeling includes, among other things, the drug's approved indication(s), dosages, "clinically significant adverse reactions," "other potential safety hazards," and "limitations in use imposed by them." *See* 21 C.F.R. § 201.57.

22.    As a precondition to, and ongoing requirement of, approval of a new drug application ("NDA"), the FDA may require the drug manufacturer to implement a "risk evaluation and mitigation strategy" ("REMS") if the FDA determines such a strategy "is necessary to ensure that the benefits of the drug outweigh the risks of the drug." 21 U.S.C. § 355-l(a)(l). As part of a REMS, the FDA may require that the drug manufacturer "develop for distribution [a Medication Guide] to each patient when the drug is dispensed," 21 U.S.C. § 355-l(e)(2), if it determines the drug "pose[s] a serious and significant public health concern requiring distribution of FDA-approved patient information," 21 C.F.R. § 208.1.

23.    Some drugs are more dangerous than others, and as such, may cause the FDA to impose additional restrictions as a condition of approval. For drugs deemed to have "inherent toxicity or potential harmfulness" and to be "associated

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

with a serious adverse drug experience," the FDA may require that a REMS include "elements as are necessary to assure safe use of the drug" to "mitigate a specific serious risk listed in [its] labeling[.]" 21 U.S.C. § 355-l(f)(l)(A). Such elements may include, without limitation, a requirement that "health care practitioners who prescribe the drug have particular training or experience, or are specially certified," that "the drug be dispensed to patients with evidence or other documentation of safe-use conditions," and that "each patient using the drug be subject to certain monitoring [or] be enrolled in a registry." 21 U.S.C. § 355-1(f)(3).

2.  *The Prohibition Against Off-Label Marketing and the Making of False and Misleading Statements Regarding an FDA-Approved Drug.*

24.     Following FDA approval of its NDA, a drug manufacturer, like Insys, may not market and promote the drug for a non-approved indication or in a manner inconsistent with the drug's FDA-approved labeling, and its marketing and promotional materials may not contain false or misleading statements about the drug. *See, e.g.*, 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. This restriction pertains to the clinical indications for which the FDA approved the drug, the dosing regimen that is supported by the clinical trials conducted to establish its safety and efficacy, as well as any other information appearing on the drug's approved labeling.

25.     If a drug manufacturer, like Insys, believes that its FDA-approved drug should be sold, marketed, or otherwise promoted for indications different than those listed on its FDA- approved labeling, the law provides a way: the manufacturer must conduct additional "adequate and well-controlled clinical trials" to test the drug's safety and efficacy for the newly proposed indications, and file a supplemental NDA with the FDA. See 21 U.S.C. § 355(c)(5); 21 C.F.R. § 314.54.

26.     Unless and until the FDA approves the drug for additional indications, any unapproved use is called "off-label," a term that refers to the use of an approved drug for an indication, or in any manner, other than what is described in the drug's approved labeling.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

27.     The above-mentioned restrictions on marketing, advertising, and false and misleading statements are in place to "protect the public health by ensuring that . . . drugs are safe and effective," 21 U.S.C. § 393(b)(2)(B), as well as guard against consumer abuse by profit-driven corporations, like Insys.

*3.     Subsys and the Highly-Potent "TIRF" Class of Fentanyl Drugs*

28.     TIRF medicines are formulations of fentanyl that deliver the drug nearly instantaneously to their users via the oral mucosa. At the time Insys submitted its March 4, 2011 NDA for Subsys, there were five available TIRF medications: Abstral (fentanyl sublingual tablet), Actiq and its generic equivalents (fentanyl citrate oral transmucosal lozenge), Fentora (fentanyl buccal tablet), Lazanda (fentanyl nasal spray), and Onsolis (fentanyl buccal soluble film).

29.     On January 4, 2012, the FDA approved Insys's NDA for Subsys, making it the sixth TIRF drug, and approved it for "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."

30.     The FDA explained that the indication for all TIRF substances, including Subsys, is "narrow" for the following reasons:

> [T]he population identified has a specific need for a treatment to address cancer-associated breakthrough pain, which is characterized by a quick onset, often high severity, and relatively short duration. These formulations of fentanyl are designed to have a relatively rapid rise to [maximum concentration] and a relatively short duration of effect. Fentanyl is a very potent opioid that can cause respiratory depression in microgram quantities. For this reason, the indication also reflects the need for patients to be opioid-tolerant, a physiological state in which patients are more tolerant to the CNS [Central Nervous System] depression and respiratory depression associated with opioids.

31.     To "ensure the benefits of the drug outweigh the risks of misuse, abuse, addiction, overdose, and serious complications due to medication errors," the FDA concluded that the approval of Subsys demanded the implementation of a Risk Evaluation and Mitigation Strategy ("REMS").

32.     REMS is a drug safety program that the FDA can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks. REMS are designed to reinforce medication use behaviors and actions that support the safe use of that medication. While all medications have labeling that informs health care stakeholders about medication risks, only a few medications require a REMS.

33.     Because the FDA found that Subsys "poses a serious and significant public health concern," it mandated, as one element of the required REMS, the "distribution of a Medication Guide," which it deemed to be "necessary for patients' safe and effective use of Subsys." In so doing, the FDA concluded that Subsys "is a product for which patient labeling could help prevent serious adverse effects and that has serious risks (relative to benefits) of which patients should be made aware" because such information "could affect patients' decisions to use, or continue to use Subsys."

34.     Insys's proposed Subsys labeling, submitted as part of its NDA and approved by the FDA, contains repeated warnings about its dangers, as well as instructions that must be followed to ensure its safe use and to mitigate its risks. Specifically, for example, Subsys's Full Prescribing Information states, among other things, as follows:

> WARNING: RISK OF RESPIRATORY DEPRESSION, MEDICATION ERRORS, ABUSE POTENTIAL
>
> Respiratory Depression
>
> Fatal respiratory depression has occurred in patients treated with transmucosal immediate-release fentanyl products such as SUBSYS, including following use in opioid non-tolerant patients and improper dosing. The substitution of SUBSYS for any other fentanyl product may result in fatal overdose.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Medication Errors

Substantial differences exist in the pharmacokinetic profile of SUBSYS compared to other fentanyl products that result in clinically important differences in the extent of absorption of fentanyl that could result in fatal overdose.

Abuse Potential

SUBSYS contains fentanyl, an opioid agonist and a Schedule II controlled substance, with an abuse liability similar to other opioid analgesics. SUBSYS can be abused in a manner similar to other opioid agonists, legal or illicit. This should be considered when prescribing or dispensing SUBSYS in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse or diversion.

35.    Subsys's label makes unequivocally clear the class of prescribers who could appropriately prescribe Subsys, and also establishes the only appropriate initial starting dose:

SUBSYS is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

As with all opioids, the safety of patients using such products is dependent on health care professionals prescribing them in strict conformity with their approved labeling with respect to patient selection, dosing, and proper conditions for use.

The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg.

36.    Subsys's label also warned that it is prohibited and highly dangerous to convert patients on a one-to-one dosage basis from other formulations of fentanyl:

Important Information Regarding Prescribing and Dispensing

**SUBSYS is not bioequivalent with other fentanyl products. Do not convert patients on a mcg per mcg basis from other fentanyl products.**

9

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

**When dispensing, DO NOT substitute a SUBSYS prescription for any other fentanyl product.** Substantial differences exist in the pharmacokinetic profile of SUBSYS compared to other fentanyl products that result in clinically important differences in the rate and extent of absorption of fentanyl. **As a result of these differences, the substitution of the same dose of SUBSYS for the same dose of any other fentanyl products may result in a fatal overdose.**

**There are no conversion directions available for patients on any other fentanyl products. (Note: This includes oral, transdermal, or parenteral formulations of fentanyl.) All patients should be titrated from the 100 mcg dose.** Titrate each patient individually to provide adequate analgesia while minimizing side effects.

(Emphases in original.)

37.   Reflecting the grave dangers Subsys poses to public health and safety, the FDA determined that Subsys could be approved "only if elements necessary to assure safe use are required as part of a REMS to mitigate the risks of misuse, abuse, addiction, overdose, and serious complications due to medication errors that are listed in the labeling." Such elements, the FDA found, "will help assure proper patient selection and dispensing of Subsys." (Emphases added.)

38.   The result was Insys's inclusion in the TIRF REMS Access Program ("TIRF REMS Access Program" or "Program")—a restricted distribution regulatory regime applicable to all TIRFs. As its name suggests, the Program governs the healthcare industry's access to TIRF drugs. All prescribers, pharmacies, distributors, and consumers seeking, respectively, to prescribe, dispense, distribute, and consume TTRFs must, by law, first enroll in the Program. To enroll, each must, among other things, acknowledge that TIRF drugs are available only through the Program and agree to comply with the Program's requirements.

39.   With regard specifically to prescribers and pharmacies, who, upon enrollment, are granted the power to prescribe and dispense, respectively, enrollment means, among other things, that they must successfully complete a "knowledge

assessment" (a quiz consisting of eleven multiple-choice questions) and acknowledge having read the Program's "Education Program for Prescribers and Pharmacists," which states, among other things, as follows:

Appropriate Patient Selection

Indication

TIRF medicines are indicated only for the management of breakthrough pain in adult patients with cancer 18 years of age and older **who are already receiving and who are tolerant to regular opioid therapy for underlying persistent cancer pain.**

TIRF medicines are intended to be used only in the care of opioid-tolerant patients with cancer and only by healthcare professionals who are knowledgeable of: and skilled in, the use of Schedule II opioids to treat cancer pain.

Risk of Misuse, Abuse, Addiction, and Overdose

TIRF medicines contain fentanyl, an opioid agonist and Schedule II controlled substance. TIRF medicines can be abused in a manner similar to other opioid agonists, legal and illicit.

These risks should be considered when prescribing or dispensing TIRF medicines in situations where the prescriber or pharmacist is concerned about an increased risk of misuse, abuse, addiction, or overdose.

Risk factors for opioid abuse include:

A history of past or current alcohol or drug abuse

A history of psychiatric illness

A family history of illicit drug use or alcohol abuse[.]

(Emphases in original.)

11

40.    On July 31, 2013, more than a year after Insys began to sell and market Subsys throughout the United States, the FDA approved a supplemental NDA submitted by Insys that slightly changed Subsys's labeling to reflect the following:

### Patients on Actiq

The initial dose of SUBSYS is always 100 mcg with the only exception of [sic] patients already using Actiq.

For patients being converted from Actiq, prescribers must use the Initial Dosing Recommendations for Patients on Actiq table below[.]

...

| Current ACTIQ Dose (mcg) | Initial SUBSYS Dose (mcg) |
| --- | --- |
| 200 | 100 mcg spray |
| 400 | 100 mcg spray |
| 600 | 200 mcg spray |
| 800 | 200 mcg spray |
| 1200 | 400 mcg spray |
| 1600 | 400 mcg spray |

### All Other Patients

Individually titrate SUBSYS to a dose that provides adequate analgesia and minimizes side effects. The initial dose of SUBSYS to treat episodes of breakthrough cancer pain is **always** 100 mcg. **When prescribing, do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS** as SUBSYS is not equivalent on a mcg per mcg basis with any other fentanyl product[.]

(Emphases in original.)

41.    Upon the FDA's approval of Subsys, Insys issued a press release hailing Subsys as a novel and revolutionary drug for treating breakthrough cancer pain ("BTCP").

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

12

42.     Since its launch in March 2012, Subsys was, and remains, extremely expensive, especially as dosage strengths increase from 100 mcg to 1600 mcg. Every year since its launch, Insys has increased Subsys's prices. The chart below summarizes the cost of a 120-dose supply of Subsys at each available dosage as of the month and year indicated:

| Strength (mcg) | December 2012 | December 2013 | December 2014 | December 2015 |
|---|---|---|---|---|
| 100 | $2,830.08 | $3,350.40 | $3,960.98 | $4,336.80 |
| 200 | $3,577.20 | $4,232.40 | $5,002.82 | $5,478.00 |
| 400 | $5,192.88 | $6,144.00 | $7,263.43 | $7,953.60 |
| 600 | $6,742.56 | $7,977.60 | $9,430.67 | $10,326.00 |
| 800 | $8,302.80 | $9,828.00 | $11,617.56 | $12,721.20 |
| 1200 | $11,470.80 | $13,536.00 | $18,861.34 | $20,652.00 |
| 1600 | $14,638.80 | $17,275.20 | $23,235.12 | $25,442.40 |

**C.     Upon the FDA's Approval of Subsys, Insys Immediately Embarked Upon a Sophisticated, Multifaceted, and Purposeful Scheme to Expand Subsys's Off-Label Prescriptions-and Insys's Profits-Without Regard to the Law or Consumer Safety.**

43.     With deliberate disregard of the health, safety, and welfare of consumers to whom its highly-potent and dangerous opioid product would be prescribed, Insys aggressively sought to grow profits by illegally increasing Subsys's off-label use.

44.     Insys effectuated its scheme in three primary ways:

(a)     One, Insys marketed Subsys in direct contravention of its FDA-approved label, including for initial prescriptions above the allowed 100 mcg dosage and prescriptions to treat non-BTCP.

(b)     Two, Insys paid for prescriber loyalty and production through various methods, including a sham speaker program through which the it paid top Subsys prescribers millions of dollars in payments.

(c)     And three, Insys went to great lengths to ensure its off-label prescriptions would be paid for by insurance companies, including by

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

13

fraudulently misrepresenting patients' diagnoses and treatment histories.

### 1. *Insys Employed a Sophisticated Approach to Market Subsys Off-Label.*

45. From the outset, Insys knew that the calculated targeting of high-volume opioid prescribers was critical to Subsys's success and trained its sales force accordingly. In particular, Insys targeted certain high-volume opioid prescribers, particularly high-dose prescribers of Actiq (and its generics), which Insys knew was mostly prescribed to non-cancer patients. Insys devised and instituted a focused targeting strategy designed, with its incentive compensation structure and other marketing tactics described below, to promote the writing of Subsys prescriptions for off-label use.

46. Throughout the course of its illicit scheme, for example, Insys routinely provided its sales force with "target lists" ranking by "deciles" healthcare providers, including dentists and podiatrists, who could write prescriptions for controlled dangerous substances. Using third-party data and myriad metrics, such as a potential prescriber's history of prescribing specific opioids, like Actiq or Fentora, or a certain class of opioids, like short acting and rapid acting opioids, Insys ranked each prescriber by likelihood of becoming a high-volume, high-dose (and, thus, more lucrative) Subsys prescriber.

47. Contrary to its repeated public acknowledgments that appropriate targets of its marketing efforts would be oncologists, the target lists Insys provided to its sales force focused on high-decile opioid prescribers—not necessarily and, indeed, rarely, oncologists-with few, if any, BTCP patients. Indeed, Insys's express marketing strategy, upon launch, was to "focus efforts on" high-decile prescribers, and then, "secondarily" to "expand efforts to oncologists[.]"

48. Insys's initial, pre-launch target lists underscore that strategy. For example, a "Hyper Target List" that Insys gave its sales force in May 2012,

contained "ROO [or Rapid Onset Opioids] targets" who would likely prescribe Subsys.

49.     Tellingly, it was not until more than a year after launch that Insys finally made some effort to target oncologists by hiring oncology-specific sales representatives ("SSPs") and creating oncology-specific target lists. Insys's actions, however, reveal that those efforts were secondary to its goal to push Subsys off-label.

50.     First, Insys employed thirty oncology-specific SSPs out of a total sales force that, at its peak, exceeded 250 SSPs.

51.     Second, Insys consistently noted internally that most oncologists were ranked in the first or second decile, placing them outside the class of practitioners Insys routinely told its sales force were the "Right Prescriber[s]."

52.     Indeed, lnsys identified as an "issue" with its "oncology penetration" strategy that few oncologists, only two to three percent nationwide, prescribed ROOs, and most oncologists were reluctant to refer patients to pain doctors.

53.     After poor performance in the oncology market, Insys disbanded its small oncology sales force approximately two years after creating it.

54.     Insys knew, and, on information and belief, has always known, that exceptional Subsys sales could only be achieved by expanding the universe of patients prescribed Subsys beyond the BTCP patient population by (i) misleading healthcare providers and patients about the safety and efficacy of off-label use; and/or (ii) finding healthcare providers who cared less about patient safety than their own profits.

55.     According to the FDA-approved Subsys label and for the express purpose of protecting patient safety, patients must be started on Subsys at a 100 mcg dose and titrated to a dose that adequately relieves the patient's BTCP.

56.     This portion of the FDA-approved label negatively impacted Insys's profitability in two ways. First, as evidenced by Insys's internal communications,

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

15

Insys management quickly realized it would not have the same level of success converting patients to long-term Subsys users if they started at 100 mcg, as opposed to higher doses. Second, higher doses of Subsys are exponentially more expensive and, therefore, much more profitable for Insys.

57.     Accordingly, under the direction of former CEO, Michael Babich ("Babich"), and Vice President of Sales, Alec Burlakoff ("Burlakoff")–both of whom have been criminally indicted by the U.S. Department of Justice on Insys-related charges of racketeering conspiracy, mail fraud conspiracy, wire fraud conspiracy, and conspiracy to violate the Anti-Kickback law–Insys employed several strategies that proved highly effective, including the (i) "effective dose" strategy, (ii) Subsys "Switch" program, and (iii) "Super Voucher" program.

58.     As part of Insys's off-label marketing scheme, Insys created and disseminated to prescribers across the Nation-including in Arizona-several template letters of medical necessity ("LMN") containing language it deemed sufficient to secure insurance reimbursement for off-label Subsys prescriptions. As Insys came to learn more about the prior authorization requirements for each insurer with whom it regularly communicated, these template LMNs grew increasingly more sophisticated and deceptive.

59.     The first LMN–which Insys referred to as the "generic LMN"– contained language that purports to justify off-label Subsys prescribing for "severe pain" and "breakthrough pain"; it does not, however, mention cancer at all.

60.     In or around the first half of 2013, in apparent recognition that an insurer might seek a better written justification for the approval of off-label Subsys prescriptions-specifically for treating non-cancer breakthrough pain, Insys created and disseminated a more robust LMN, which it called the "strong LMN." The strong LMN purported to provide medical evidence in support of off-label uses, but it was replete with misleading and false information.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

16

61.     For example, the strong LMN represented that "[t]he literature since 2007 shows a favorable safety profile [for Rapid Onset Opioids]," but omitted any reference to opioid-induced hyperalgesia or any of the other dangers, such as addiction, respiratory depression and death, attendant to the use of a TIRF, such as Subsys.

62.     The strong LMN also stated that "[a]rticles as well as recent studies which are peer reviewed are available by Lynn Webster, M.D. [sic] et al showing efficacy of a rapid onset opioids [sic] in non-cancer patients . . . ."

63.     Insys's use of these LMNs to secure insurance coverage for off-label Subsys prescriptions was pervasive. Indeed, these LMNs appear in medical records for patients residing in no fewer than ten states, including in Alabama, Arizona, California, Colorado, Connecticut, Florida, New Jersey, New York, Pennsylvania and Texas.

64.     Insys's strong LMN also stated that the doctor submitting the LMN "would expect this necessity [to take Subsys] to continue for a life-long period."

65.     Underscoring Insys's use of the strong LMN for off-label uses, Insys utilized a separate LMN, which it named the "Perfect Cancer LMN," to be used exclusively for on-label purposes, namely a 100 mcg dose for patients suffering from BTCP who were already receiving and who were tolerant to around-the-clock opioid therapy. Accordingly, the strong LMN served no purpose other than to facilitate Insys's deceptive promotion of Subsys off-label.

66.     To facilitate insurance coverage for off-label Subsys prescriptions, Insys created several iterations of what it called "Opt-In Forms". These forms also served to alleviate prescribers' frequently expressed concerns about the burdens of the prior authorization process, which Insys executives identified as a hurdle to securing increased Subsys prescriptions.

67.     At least one widely-used version of these forms contained a pre-printed list of thirteen possible diagnoses for Subsys, of which only one was cancer. The

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

17

other twelve were for non-FDA-approved indications, including "Chronic Pain Syndrome," "Dysphagia," and "Degeneration of cervical intervertebral disc/Degeneration of cervicothoracic intervertebral disc."

68.    In so doing, Insys misleadingly and deceptively represented to patients, insurers, and pharmacy benefit managers ("PBMs") that it was appropriate and acceptable to prescribe Subsys for those off-label purposes.

69.    For example, on February 27, 2013, top Insys executive Michael Gurry, emailed the entire sales team, enclosing a "completed" form that he deemed to be a good example of a completed 'opt in' form," which sales representatives could use to "coach HCP offices." The attached completed IRC form was for a non-cancer patient with chronic pain, a clear off-label indication for Subsys. Notably, perhaps aware of the inappropriateness of his email, Gurry attempted to recall it a few hours later.

70.    It was Insys's express intent that these forms be used specifically to obtain off-label Subsys prescriptions and, on information and belief, to mislead patients, insurers, and PBMs. And it worked: Insys received completed Opt-In forms on behalf of over 850 patients.

71.    In furtherance of its illicit off-label marketing scheme, Insys motivated its sales force to unscrupulously sell Subsys by any means necessary, including through its compensation structure, which was heavily weighted on commissions and rewarded the achievement of certain goals known to the company to increase off-label Subsys prescriptions.

72.    Indeed, Insys management took great pains to remind its sales force that "Higher Doses= Higher Payouts!" and "More Patients= More$$$!"

73.    And in an industry in which bonus compensation and aggressive management are not unique, in or around 2016, an outside consulting firm concluded that Insys's incentive compensation structure was troubling because it incentivized non-compliant behavior and was "way outside the norm."

74.     As recently as June 2016, in response to the consulting firm's findings, Insys Executive Vice President and former COO Daniel Brennan ("Brennan") emailed Kapoor to relay his serious concerns about Insys's "overall sales rep compensation" structure, as well as Insys's hiring of subpar pharmaceutical representatives. In particular, Brennan explained that Insys is "still creating an environment of non-compliance by paying a low base salary (barely above minimum wage) and then very high ratio of incentive pay as their overall comp."

75.     Indeed, as Brennan explained to Kapoor, the consulting firm's interviews of Insys's employees revealed that they themselves found that Insys's "compensation structure encouraged inappropriate behavior," which Brennan assumed to mean "off label promotion and quid pro quo behavior." In Brennan's words, "with a potent pain product like (Subsys) ha[s], it is dangerous to have so little previous pharma experience/training." Brennan "strongly recommended" a change in payment structure "that is more in line with industry standards and creates a more compliant-behaving sales organization (important given the scrutiny we have with DOJ and media coverage of our company-both affecting our reputation and trust with customers and our internal personnel)."

76.     After Kapoor forwarded Brennan's email to Insys Board Member Patrick Fourteau, Fourteau replied to Brennan by stating that he did "not like either the tone or the substance of [Brennan's] message."

77.     When Kapoor responded to Brennan's email the following day, he, among other things, attempted to shift the blame from Insys to Brennan: "To be entirely honest, I am a little concerned that your email directly follows on the heels of the recent termination discussions (and actions) related to your commercial team."

2.     *In Exchange for Off-Label and Continued Subsys Prescribing at High Doses, Insys Provided Kickbacks to Arizona Prescribers*

78.     To guarantee that healthcare providers continued to prescribe Subsys off-label to their patients at high doses, Insys paid them kickbacks. These payments,

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

19

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

which amounted to millions of dollars over the years, were disguised as bona fide compensation for participation at sham lnsys-organized and Insys-sponsored "informational events" and for serving as consultants or advisors on sham Insys-organized boards. Insys's payment of kickbacks to certain key healthcare providers was central to its scheme, and as such, lnsys devoted a substantial amount of its budget to bribing them.

79.   The primary way Insys bribed Subsys prescribers was its so-called "Insys Speaker Bureau" ("ISB"). The ISB was established shortly after Subsys's market launch purportedly to "support [Insys's] marketed prescription drugs products." According to an Insys-generated standard operating procedure document from November 2012, "[s]peakers selected to participate in bureaus are responsible for delivering INSYS Speaker Programs (ISPs), with the objective of educating and informing healthcare professionals (HCPs) in the medical community about marketed INSYS products in a fair and balanced manner." That document claimed that an "HCP must never be engaged as a speaker in order to induce, influence, or reward him or her for using any INSYS product."

80.   The reality, however, was far different. Contrary to the ISB's professed purpose of "educating and informing healthcare professionals," Insys routinely equated successful "speaker programs" or "ISPs" with a high "return on investment" or "ROI." Moreover, as demonstrated by Insys's own documents, it intended that its "speakers" would write Subsys prescriptions in exchange for more ISB events.

81.   For example, by email dated March 14, 2013, Burlakoff noted that the only sales representatives to whom Insys should allocate "ISP funds" are those who "get the most bang for their buck using our money." In that email, he griped that "I am tired of giving money to reps whom [sic] produce zero return on investment" and stated that "[t]hose whom [sic] do not produce ROI from programs should not be spending our ISP dollars[.]"

20

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

82.     Similarly, Insys management regularly instructed its sales representatives to offer speaking engagements to the "docs" who show a "willingness to prescribe," which, as Serra explained to his sales force in August 2012, "is basically why we have jobs." Notably, in that same email, Serra expressly discouraged his sales representatives from targeting oncologists as possible speakers, instead instructing them to focus their efforts elsewhere because "[r]ight now there are way too many Pain Targets that need to prescribe."

83.     The next month, Burlakoff emailed the entire sales force, with a BCC to Kapoor, to reiterate this point: "If you cannot guarantee that [a speaker] program will yield positive results, the program should not take place." Burlakoff explained that "[t]hese programs have been offered to you as the #1 opportunity to grow your business" and reminded them that they "get paid to produce tangible results."

84.     Burlakoff proceeded to instruct the sales force on how to guarantee success of an ISP: "Your program will absolutely NEVER be successful if your speaker does not have at least 10 times more clinical experience than all of your attendees combined! If your speaker is not an expert with the utilization of Subsys in his or her clinical practice, then your speaker need not speak for Insys anymore."

85.     In a reply to a sales representative's response to this email, Burlakoff wrote: "Your local speaker should be your 'business partner'. You do not work for him, nor does he work for you. You are partners in this endeavor, if your speaker does not see it this way[,] then it is time to identify another speaker."

86.     Insys leadership's insistence on speakers with significant "clinical experience" had nothing to do with those speakers' ability to better educate speaker program attendees.

87.     When considered together with the conduct, statements, and expectations of other Insys executives and representatives, as well as the reality that most, if not all of the ISPs were shams in which no actual educational presentation was made, it becomes clear that Burlakoff's reference to "clinical experience" means

21

that a speaker's admission to the Speaker Bureau was, and remained, contingent upon the speaker's demonstration of loyalty to Insys by writing Subsys prescriptions.

88.     Insys's kickback scheme was highly effective in securing prescribers' continued writing of Subsys prescriptions.

> 3.     *Insys Established an Internal Business Unit Charged With Fraudulently Inducing Insurers and PBMs to Pay for Off-Label Subsys Prescriptions.*

89.     Because of Subsys's high cost, most consumers are not able to obtain it without insurance coverage. At all times relevant to this Complaint, Insys's financial success, therefore, depended upon approval of Subsys prior authorization requests, often a prerequisite to insurance coverage for any costly and dangerous medication or therapy.

90.     Initially, Insys encountered a significant obstacle to securing consistent insurance coverage for Subsys: Most third-party payers generally would not pay for Subsys unless, among other things, it was prescribed to manage BTCP. Because the population of BTCP patients is very small and, as Insys was well aware, comprised only a fraction of its prescriptions, Insys could not meet its lofty sales goals without facilitating insurance coverage approval for off-label Subsys prescriptions.

91.     Indeed, around eight months post-launch, only approximately thirty to thirty-three percent of all Subsys prescriptions had received prior authorization.

92.     Cognizant that this low number of successful Subsys prior authorizations threatened its business, Insys executives schemed to overcome this obstacle through the use of fraud, misrepresentations, and false pretenses.

93.     In or around November 2012, Insys established an in-house business unit comprised of so-called "prior authorization specialists," whose sole purpose was to "do whatever it takes" to secure insurance coverage approval for all Subsys prescriptions, particularly those written off-label.

94.     Insys, by and through this unit, initially known as the Insys Reimbursement Center ("IRC"), and later, as the Patient Services Center ("PSC"),

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

engaged in pervasive insurance fraud to ensure third-party payer approval of the off-label Subsys prescriptions that inevitably resulted from Insys's illegal conduct (as described above).

95.     When the IRC was first established, only twelve prescribers used it to obtain prior authorizations. Just over a year later, by December 2013, more than 950 prescribers nationwide had made use of the IRC's "services," and the IRC had secured approval for more than 90% of prior authorization requests that it processed.

96.     Insys, by and through the IRC, fraudulently induced insurers to pay for off-label Subsys prescriptions in three principal ways.

97.     First, Insys hid the existence of the IRC and misrepresented that prior authorization calls made by the IRC were coming from healthcare providers.

98.     Second, Insys falsely reported, both verbally and in writing, that patients had cancer and breakthrough cancer pain in order to secure authorization.

99.      Third, Insys created a pay structure for IRC staff that rewarded fraudulent behavior with substantial bonuses.

**D.     Arizona Purchasers of Health-Care Insurance Have Sustained Substantial Harm as a Result of Defendant's Misconduct.**

100.     Health insurance is an individual or group policy that provides coverage for hospital, medical, surgical, and/or prescription drug benefits.

101.     Defendant's misconduct has increased Plaintiff's cost of private health insurance in Arizona.

102.     In 2014, Arizona residents paid more than $43 billion for healthcare, of which over $15 billion was spent on private health insurance. As is true throughout the country, health care costs in Arizona are increasing at a rate far above core inflation. From 1991 to 2014, Arizonans spent an average of 6.9% more per year on personal, health-care-related expenses.

103.     Insurance premiums—the fees paid to get and keep insurance—have risen at an even more alarming clip. From 2001 to 2014, Arizona enrollees in private

23

health insurance have spent 6.3% more per year, increasing the total amount spent per person from $1,932 in 2001 to $4,035 in 2014. The average Arizona family of four enrolled in private health insurance pays more than $16,000 per year to cover premiums, co-pays, and other health-care related expenses.

104.    Many Arizona employees obtain health insurance through an employer. Arizona's providers of group health care insurance include: Aetna Health Inc. and AetnaAARP Health Insurance, Assurant Health Insurance, Celtic Health Insurance, Cigna Health Insurance, National General Benefits Solutions, Humana, UnitedHealthCare, and Blue Cross Blue Shield of Arizona.

105.    Other Arizonans obtain individual health insurance. As elsewhere, Arizonans typically buy individual health insurance when they do not have access to an employer plan and do not qualify for public health insurance like Medicaid or Medicare. Arizona's providers of individual health insurance include: Aetna, Blue Cross Blue Shield of Arizona, Cigna Health and Life Insurance Company, Health Choice Insurance Co, Health Net Life Insurance Company, Health Net of Arizona, Human Health Plan, Inc., Meritus Health Partners, University of Arizona Health Plans.

106.    Group participants may pay all or part of the premium directly, or their employers may pay all or part of the premium directly. Individual purchasers (or members of their family) pay the entire premium directly. The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance starts to cover healthcare costs. A "co-pay" is a flat amount the insured pays per claim, such as a doctor visit or prescription. "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met. Deductibles and co-payments often are higher under individual plans.

107.    As a direct and proximate result of the conduct described herein, natural and corporate persons have sustained losses and injuries in the form of higher

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

premiums, deductibles, and co-payments/co-insurance. Health care insurers in Arizona have paid (and expect to continue to pay) substantial amounts for opioid prescriptions that would never have been prescribed and/or filled absent Defendant's misconduct, and have also paid (and expect to continue to pay) substantial amounts for treatment of individuals who became addicted to opioids and/or who became addicted to heroin or other drugs because of opioid use. Many of those individuals who became addicted to opioids—or who became addicted to heroin or other drugs because of opioid use—would never have become addicted or even received access to opioids absent Defendant's conduct described herein. These insurers have also paid for numerous other costs proximately caused by Defendant's conduct, including care for babies born addicted to opioids, emergency-room treatments, and other claims.

108.   Plaintiff purchasers of private health insurance have been damaged as a result of paying prices that are higher as a direct result of Defendant's misconduct. Arizona health insurers are easily able to—and do—pass higher costs onto their insureds. Premiums in health-insurance markets do not reflect individual differences in costs, meaning that all insureds bear higher costs inflicted by the highest-risk insureds.

109.   In Arizona, as in most other states, insurers charge premiums based on assigned rate classes, a pool of insured individuals with similar health status. Because the premium charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone. This empirical reality makes economic sense. Insurers cannot know ex ante if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient. So insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future, opioid-related claims.

110.   This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients, in Arizona

and nationwide. In 2015, total annual per-patient charges (the costs of providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

111.   Thus, as the opioid crisis has barreled forward across the country and in Arizona, so has the pressure on insurance companies to raise premiums. Indeed, by one estimate, private insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, and upon information and belief by a comparable percentage in Arizona, with the brunt of this burden falling on those aged 19 to 35. This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans and Arizonans over this period. Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

112.   The costs that Defendant's conduct inflicted on the insurance market cannot be and have not been confined to opioid users because of such risk pooling. Empirical evidence evaluated by leading economists confirms this common-sense conclusion. In addition, many of the costs that Defendant has inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since Arizona is like "all states [that] have mandated certain benefits that must be included in the health insurance package of that state, most commonly for substance abuse." Jonathan Gruber and Helen Levy, (2009). The Evolution of Medical Spending Risk, J. OF ECON. PERSPECTIVES, 23(4), pp. 25-48, at 32.

**E. Insys Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Its Actions.**

113. When engaging in the conduct described herein, Insys acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of its actions.

114. Insys knew and should have known about these harms that its unlawful and unfair business practices have caused and continue to cause in Arizona. Insys closely monitored its sales and the habits of prescribing doctors. Its sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. It knew—and, indeed, intended—that its misrepresentations would persuade doctors in Arizona to prescribe and patients in Arizona to use their opioids for off-label uses, including chronic pain.

115. At all relevant times, Insys knew that the likely consequences of its actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in Arizona, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

116. Despite this knowledge, Insys engaged in the conduct described herein for the purpose of obtaining millions of dollars in windfall profits, while destroying the lives of countless Arizonans.

117. Insys's actions are not excused by the fact that its drug labels may have allowed or did not exclude the use of opioids for chronic pain. Indeed, Insys's misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

118. Nor is Insys's causal role broken by the involvement of doctors. Insys' marketing efforts were ubiquitous and highly persuasive. Its deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Insys also was able to harness and

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

hijack what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

119.    While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Defendant's pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long-term pain management. Insurers paid for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency-room care, and other claims. Those costs were ultimately passed along to Plaintiff and all Class Members.

120.    Insys's acts complained of herein were intentional, wanton, willful, and guided by an evil hand and mind.  Accordingly, Plaintiff seeks an award of punitive damages.

## FACTS SPECIFIC TO PLAINTIFF

121.    Plaintiff is a natural person and resident and citizen of the State of Arizona.

122.    Since at least 2015, Plaintiff has purchased health insurance through his employer.

123.    Plaintiff currently purchases health insurance from Health Net of Arizona.

## CLASS ALLEGATIONS

124.    **Class Definition**: Plaintiff brings this action pursuant to Ariz. R. Civ. P. 23(b)(2) and (3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons (including natural persons and entities) who purchased health insurance policies in Arizona from 1996 through the present; and all persons who paid for any portion of employer-provided health insurance from 1996 through the present.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Excluded from the Class are: (1) any Judge or Commissioner presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant has a controlling interest and its current, former, purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendant; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant.

125.   **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. As of 2014, the Centers for Medicare and Medicaid Services estimated that almost four million people in Arizona enrolled in private health insurance. Ultimately, the Class members will be easily identified through third-party business records.

126.   **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not necessarily limited to the following:

• whether Defendant made material misrepresentations regarding the benefits and risks of its products;

• whether Defendant acted intentionally with respect to the foregoing;

• whether Defendant was negligent in the distribution of its products;

• whether Defendant acted in violation of state law;

• whether the Class is entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under Arizona law; and

• whether Plaintiff is entitled to damages and/or injunctive relief.

127.   **Typicality**: Plaintiff's claims are typical of the claims of all the other Class members. Plaintiff and the Class members sustained substantially similar

damages as a result of Defendant's uniform wrongful conduct, based upon the same interactions that were made uniformly with Plaintiff and the public.

128.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other Class members.

129.   **Policies Generally Applicable to the Class**: Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

130.   **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class members will likely be relatively small compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for individual Class members to obtain effective relief from Defendant's misconduct. Even if Class members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

131.   Plaintiff reserves the right to revise the Class Definition and Class Allegations based on further investigation, including facts learned in discovery.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

## CAUSES OF ACTION

### COUNT I:
### Violations of Arizona's Consumer Fraud Act, A.R.S. §§ 44-1521–34

132.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

133.    Plaintiff brings this Count on behalf of all members of the Class who are or have been residents of Arizona at any relevant time.

134.    Arizona's Consumer Fraud Act prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

135.    Defendant's business practices as described in this Complaint are deceptive, unconscionable, and violate Arizona law because the practices deceived doctors, insurers, and consumers in Arizona, led to the sale of opioids that should not have been sold, and thereby caused Plaintiff and Class Members to pay higher insurance premiums.

136.    Defendant knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false, misleading, deceptive and unconscionable. Defendant's omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Arizona doctors, who prescribed opioids based on the Defendant's deception, and insurers who purchased, or covered the costs for the purchase of, opioids for chronic pain.

137.   Defendant's fraudulent, unlawful, and/or deceptive activity alleged herein caused insurers to pay for ineffective and dangerous treatments, as well as the increased costs associated with opioid addiction. Those costs were passed on to Plaintiff and members of the Class in the form of increased insurance premiums.

138.   As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations described in this Complaint.

***COUNT II:***
***Pattern of Unlawful Activity, A.R.S. § 13-2314.04***

139.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

140.   Plaintiff is a "person," and Class Members are "persons," under A.R.S. § 13-2314.04(A).

141.   Insys engaged in a pattern of unlawful activity that has caused harm to Plaintiff and Class Members.

142.   Insys has committed at least two or more acts of unlawful activity as defined by § 13-2301(D)(4). These acts include those set out in Paragraphs 43 through 99 above concerning the pattern of racketing activity, which are incorporated by reference.

143.   These acts are qualifying unlawful acts under at least A.R.S. § 13-2301(D)(4)(b)(xv) and (xx) because they involve the assertion of false claims, and a scheme or artifice to defraud.

144.   These false statements and unlawful acts by Insys all have a same or similar purpose in furthering opioid prescribing and increasing sales of opioids without regard to diversion, and functioned within a structure designed to effectuate the common purpose.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

145.    These false statements and unlawful acts also had the same victims (Plaintiff and Class Members) and results (causing Plaintiff and Class Members to be injured in their business or property in the form of increases in insurance premiums), as well as other similar characteristics.

146.    These unlawful acts are each related to each other. Insys made these knowing and intentional misrepresentations for their own financial gain. These acts would have been deceptive to persons of ordinary prudence and comprehension.

147.    These acts were continuous and reflect Insys's regular way of conducting business over the time period described above.

148.    The purpose of this scheme by Insys was its own financial gain.

149.    As a direct and proximate cause of this pattern of unlawful activity by Insys and the actions of Insys and its employees, under Insys's control, Plaintiff and Class Members have sustained damages in an amount to be proven at trial.

150.    Plaintiff's and Class Members' damages were reasonably foreseeable to Insys and treble damages are appropriate.

151.    In addition, Plaintiff and Class Members are entitled to their reasonable attorneys' fees and costs as provided under A.R.S. §§ 13-2314.04(A), (D)(4).

### COUNT III:
### *Public Nuisance, A.R.S. § 13-2917*

152.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

153.    Arizona law prohibits Insys from causing "anything . . . injurious to health . . . that interferes with the comfortable enjoyment of life or property by an entire community or neighborhood or by a considerable number of persons."

154.    Insys, acting individually and in concert with others, has created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in Arizona.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

155.   The public nuisance is substantial and unreasonable. Insys's actions caused and continue to cause the public health epidemic described above, and that harm outweighs any offsetting benefit.

156.   Insys knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—i.e., the opioid epidemic. Insys's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Its actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain.

157.   Without Insys's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

158.   Insys's actions have increased the cost of insuring individuals, and Plaintiff and Class Members—who pay insurance premiums—are injured.

159.   The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Insys can be abated and further recurrence of such harm and inconvenience can be abated.

160.   Plaintiff requests an order providing for abatement of the public nuisance that Insys created or assisted in the creation of, and enjoining Insys from future violations of Arizona law.

### COUNT IV:
### Unjust Enrichment

161.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

162.   To the detriment of Plaintiff and Class members, Insys has been, and continues to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

163.    Insys has voluntarily accepted and retained the inflated prices paid for its opioid products with full knowledge that it was not lawfully entitled to it.

164.    Plaintiff and Class members bear the costs of the benefits conveyed to Insys in the form of increased insurance premiums.

165.    Between Insys and Plaintiff/Class members, it would be unjust for Insys to retain the benefits attained by their wrongful actions.

166.    Insys has been unjustly enriched, in the form of inflated prices, at the expense of Plaintiff and Class members who are entitled in equity to disgorgement and restitution of Insys's wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court, and any other relief the Court deems just and proper to remedy Insys's unjust enrichment.

## COUNT V:
### Negligence

167.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

168.    Insys has a duty to exercise reasonable care in manufacturing and distributing highly dangerous medications in the State of Arizona.

169.    Insys owe that duty to Plaintiff and Class Members. Insys's profits are inextricably bound with the industry of health insurance, and any reasonably prudent pharmaceutical company is aware of the basic mechanics of the insurance industry by which costs are passed on to others in a risk pool through premiums.

170.    Insys knew and should have known that misleading doctors and insurers about the safety and efficacy of opioids for long-term pain treatment would cause significant costs, not just to those for whom opioids were an ineffective and dangerous treatment, but to insurers that absorb healthcare costs, and thus ultimately to insurance customers.

171.    Insys breached its duty to Plaintiff and Class Members through its false and misleading promotion of opioids and their deceptive marketing scheme,

misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

172.    Insys's conduct caused opioids to become widely available and widely used, and Insys's actions were, at the very least, a substantial factor in the widespread abuse of opioids. Without Insys's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

173.    As described above, Insys's breach caused and proximately caused damages to Plaintiff and Class Members.

## PRAYER FOR RELIEF

174.    Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

A. Declaring that the claims brought by Plaintiff may be maintained as a class action;

B. Declaring that Insys has engaged in unlawful, fraudulent, deceptive, and unconscionable business acts and practices in violation of the Arizona Consumer Fraud Act;

C. Ordering Insys to pay restitution of any money acquired by its unlawful, fraudulent, deceptive, and unconscionable business practices;

D. Declaring that Insys has created a public nuisance and enjoining Insys to abate the public nuisance that it created.

E. Declaring that Insys has been unjustly enriched by its conduct;

F. Ordering Insys to pay restitution of all benefits and disgorge all profits unjustly retained by Insys;

G. Declaring that Insys has acted negligently;

H. Ordering Insys to pay all damages caused to Plaintiff and Class Members by its negligent actions;

I. Awarding treble and punitive damages as appropriate;

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

J.  Awarding injunctive relief as necessary to protect the interests of Plaintiff
and the Class;

K.  Awarding Plaintiff and the members of the Class their reasonable
litigation expenses and attorneys' fees;

L.  Awarding Plaintiff and the members of the Class pre- and post-judgment
interest, to the extent allowable; and

M. Awarding such other and further relief as equity and justice may require.

DATED this 17th day of September, 2018.

KERCSMAR & FELTUS PLLC

By: */s/ Sean J. O'Hara*
Todd Feltus
Sean J. O'Hara
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251

William S. Consovoy*
Thomas R. McCarthy*
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Michael H. Park*
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: 212.247.8006

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Ashley Keller*
Travis Lenkner*
Seth Meyer*
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 2570
Chicago, Illinois 60606
Tel: 312.741.5220

*Pro Hac Vice admission to be sought

Attorneys for Plaintiff and the Putative Class

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

CHRIS DEROSE, CLERK
RECEIVED DOC #4
NIGHT DEPOSITORY

**18 SEP 20  AM 9: 43**

**FILED**
BY E. VAZQUEZ, DEP

**Person Filing:** Todd Feltus, Sean J. O'Hara
**Address (if not protected):** Kercsmar & Feltus PLLC, 7150 E Camelback Rd
**City, State, Zip Code:** Suite 285, Scottsdale, AZ 85251
**Telephone:** (480) 421-1001
**Email Address:** tfeltus@kflawaz.com sjo@kflawaz.com
**Lawyer's Bar Number:** 019076, 024749

Representing ☐ Self, without a Lawyer  or ☒ Attorney for ☒ Plaintiff  OR ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

**ORIGINAL**          CV 2018-011335

Ramon Martin, et al.                                    **Case No.:** _____

Name of Plaintiff

And

**SUMMONS**

Insys Therapeutics, Inc., a Delaware corporation
Name of Defendant

**WARNING: This is an official document from the court that affects your rights. Read this carefully. If you do not understand it, contact a lawyer for help.**

**FROM THE STATE OF ARIZONA TO:** Insys Therapeutics, Inc. c/o CT Corporations System
Name of Defendant

1. **A lawsuit has been filed against you. A copy of the lawsuit and other court papers are served on you with this *"Summons"*.**

2. **If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the:**

   • **Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 OR**

   • **Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 OR**

   • **Office of the Clerk of Superior Court, 222 East Javelina Avenue, Mesa, Arizona 85210-6201 OR**

   • **Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.**

   **Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.**

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED                                                    CV11f -0929-7

Case Number: _____

3.  If this **"Summons"** and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your **"Response"** or **"Answer"** must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this **"Summons"** and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

    - 601 West Jackson, Phoenix, Arizona 85003
    - 18380 North 40th Street, Phoenix, Arizona 85032
    - 222 East Javelina Avenue, Mesa, Arizona  85210
    - 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SEP 1 7 2018

SIGNED AND SEALED this date _____

CHRIS DEROSE, CLERK OF SUPERIOR COURT

By _____

Deputy Clerk

A. Hatch

If you would like legal advice from a lawyer, contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f-092917

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

Client File # 102226-1421
Account   # 0850
Invoice    # 317803
Liddy      # 275476-1

CHRIS DEROSE, CLERK
RECEIVED CCC #4
NIGHT DEPOSITORY

18 SEP 20  AM 9:43

FILED
BY E. VAZQUEZ, DEP

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
### IN AND FOR THE COUNTY OF MARICOPA

**RAMON MARTIN, et al.,**

                                             Plaintiff(s),

**vs**

**INSYS THERAPEUTICS, INC., a Delaware corporation,**

                                             Defendant(s).

**CERTIFICATE OF SERVICE
BY PRIVATE PROCESS SERVER**
Case No. CV2018-011335

ORIGINAL

**ENTITY/PERSON TO BE SERVED:** Insys Therapeutics, Inc. c/o CT Corporation System, Statutory Agent

**PLACE OF SERVICE:**          3800 North Central Avenue, Suite 460, Phoenix, AZ, 85012

**DATE OF SERVICE:** On the  __18th__  day of __September__ , __2018__  at  __9:32__   __AM__    County __Maricopa__

[ ] PERSONAL SERVICE   [✗] Left a copy with a person authorized to accept service.   [ ] At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein.

**Name of Person Served and Relationship/Title**   Served on CT Corporation System, Statutory Agent, by serving Scott Whaley, Associate Corporate Operations Specialist, authorized to receive and accept service of process in the State of Arizona by CT Corporation System.

on  __09/17/2018__ _____we received the following documents for service:

Summons, Complaint, Certificate Re Compulsory Arbitration, and Civil Court Sheet

**Received from KERCSMAR & FELTUS, PLLC, ( SEAN J. O'HARA #024749 )**

PROCESS SERVER:  __Jon Schira #8094__

**The undersigned states: That I am a certified private process server in the county of Maricopa and am an Officer of the Court.**

SIGNATURE OF PROCESS SERVER: _____   Date: __9/19/2018__

| Item | Amount |
|------|--------|
| Service of Process | $16.00 |
| Minimum Mileage | $16.00 |
| Doc. Prep Fee | $10.00 |

**Tax ID#** 90-0533870
I declare under penalty of perjury that the foregoing is true and correct and was executed on this date.

| | |
|--|--|
| Total | $42.00 |

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737



Client File # 102226-1421
Account   # 0850
Invoice   # 318031
Liddy     # 275767-1

FILED
BY E. VAZQUEZ, DEP

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

RAMON MARTIN, individually, et al.,

                                   Plaintiff(s),

vs.

INSYS THERAPEUTICS, INC., a Delaware corporation,

                                   Defendant(s).

**CERTIFICATE OF SERVICE
BY PRIVATE PROCESS SERVER**
Case No. CV2018-011335

ORIGINAL

**ENTITY/PERSON TO BE SERVED:** Insys Therapeutices, Inc. c/o CT Corporation System, Statutory Agent

**PLACE OF SERVICE:**        3800 N. Central Ave., Suite 460, Phoenix, AZ 85012

**DATE OF SERVICE:** On the ___19th___ day of __September__, _2018_ at __2:40__ PM    County __Maricopa__

☐ PERSONAL SERVICE  ☒  Left a copy with a person authorized to      ☐   At this usual place of abode, I left a copy
                          accept service.                                with a person of suitable age and discretion
                                                                         residing therein.

**Name of Person Served and Relationship/Title**   Served on CT Corporation System, Statutory Agent, by serving Scott Whaley,

Associate Corporate Operations Specialist, authorized to receive and accept service

of process in the state of Arizona by CT Corporation System.

on ____9/19/2018____ we received the following documents for service:

Notice of Errata with Exhibit "A" - Complaint

**Received from KERCSMAR & FELTUS, PLLC, ( SEAN J. O'HARA #024749 )**

PROCESS SERVER: ___Floyd R. Brown #8388___

**The undersigned states: That I am a certified private process server in the county of Maricopa and am an Officer of the Court.**

SIGNATURE OF PROCESS SERVER: _____Floyd R Brown_____ Date: _9/20/2018_

| Item | Amount |
|---|---|
| Service of Process | $16.00 |
| Minimum Mileage | $16.00 |
| Rush Charge Service | $30.00 |
| Doc. Prep. Fee | $10.00 |

**Tax ID# 90-0533870**
I declare under penalty of perjury that the foregoing is true
and correct and was executed on this date.

Total        $72.00

Santos Case, Clerk of Court
*** Electronically Filed ***
T. Hays, Deputy
10/12/2018 3:04:00 PM
Filing ID 9792603

Brian Schulman (016008)
schulmanb@ballardspahr.com
Michael S. Myers (029978)
myersms@ballardspahr.com
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone:   602.798.5400
Facsimile:    602.798.5595

J. Matthew Donohue (Oregon 065742)
matt.donohue@hklaw.com
Joseph L. Franco (Oregon 073913)
joe.franco@hklaw.com
*Pro hac vice Applications To Be Submitted*
HOLLAND & KNIGHT LLP
111 S.W. Fifth Avenue
Portland, OR 97204
Telephone:   503.517.2941
Facsimile:    503.241.8014
*Attorneys for Defendant*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| RAMON MARTIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INSYS THERAPEUTICS, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. CV2018-011335<br><br>**NOTICE OF APPEARANCE**<br><br>(Honorable Christopher Whitten) |

**NOTICE IS HEREBY GIVEN** that Brian Schulman and Michael S. Myers of the law firm of Ballard Spahr LLP, are entering an appearance herein for Defendant Insys Therapeutics, Inc. and hereby request that a copy of any notices, pleadings, agendas or other relevant documents in this case be delivered to the following address:

Brian Schulman, Esq.
Michael S. Myers, Esq.
Ballard Spahr LLP
1 E. Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Email: schulmanb@ballardspahr.com
Email: myersms@ballardspahr.com

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

RESPECTFULLY SUBMITTED this 12th day of October, 2018.

BALLARD SPAHR LLP

By: */s/ Michael S. Myers*
    Brian Schulman (016008)
    Michael Myers (029978)
    1 East Washington Street, Suite 2300
    Phoenix, AZ 85004-2555

    J. Matthew Donohue (Oregon 065742)
    Joseph L. Franco (Oregon 073913)
    HOLLAND & KNIGHT LLP
    111 S.W. Fifth Avenue
    Portland, OR 97204

    *Attorneys for Defendant*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

## CERTIFICATE OF SERVICE

I certify that on this 12th day of October, 2018, I electronically transmitted a PDF version of this document to the Office of the Clerk of the Superior Court, Maricopa County, for filing using the AZTurboCourt System.

A complete copy of the foregoing sent via email this same date to the following:

Todd Feltus
Sean O'Hara
Kercsmar & Feltus PLLC
7150 E. Camelback Road, Suite 285
Scottsdale, Arizona  85251
tfeltus@kflawaz.com
sjo@kflawaz.com
*Attorneys for Plaintiff*

*/s/ Tasha Hart*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

Chris DeRose, Clerk of Court
*** Electronically Filed ***
M. De La Cruz, Deputy
10/12/2018 3:14:00 PM
Filing ID 9792710

Brian Schulman (016008)
schulmanb@ballardspahr.com
Michael S. Myers (029978)
myersms@ballardspahr.com
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone:   602.798.5400
Facsimile:   602.798.5595

J. Matthew Donohue (Oregon 065742)
matt.donohue@hklaw.com
Joseph L. Franco (Oregon 073913)
joe.franco@hklaw.com
*Pro hac vice Applications To Be Submitted*
HOLLAND & KNIGHT LLP
111 S.W. Fifth Avenue
Portland, OR 97204
Telephone:   503.517.2941
Facsimile:   503.241.8014
*Attorneys for Defendant*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

RAMON MARTIN, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

INSYS THERAPEUTICS, INC., a Delaware corporation,

Defendant.

CASE NO. CV2018-011335

**STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT**

(Honorable Christopher Whitten)

Defendant Insys Therapeutics, Inc. ("Defendant") and Plaintiff Ramon Martin ("Plaintiff"), through undersigned counsel, hereby stipulate and agree to extend the deadline for Defendant to respond to the Complaint in this action through November 7, 2018.

/ / /

/ / /

/ / /

/ / /

DMWEST #18150413 v1

STIPULATED AND AGREED TO this 12th day of October, 2018:

KERCSMAR & FELTUS PLLC          BALLARD SPAHR LLP


By: */s/ Sean J. O'Hara* (with permission)     By: */s/ Michael S. Myers*
    Todd Feltus                                    Brian Schulman
    Sean O'Hara                                    Michael S. Myers
    7150 E. Camelback Road, Suite 285              1 East Washington Street, Suite 2300
    Scottsdale, Arizona  85251                     Phoenix, AZ 85004-2555
    *Attorneys for Plaintiff*                        *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 12th day of October, 2018, I electronically transmitted a PDF version of this document to the Office of the Clerk of the Superior Court, Maricopa County, for filing using the AZTurboCourt System.

A complete copy of the foregoing sent via email this same date to the following:

Todd Feltus
Sean O'Hara
Kercsmar & Feltus PLLC
7150 E. Camelback Road, Suite 285
Scottsdale, Arizona  85251
tfeltus@kflawaz.com
sjo@kflawaz.com
*Attorneys for Plaintiff*

*/s/ Tasha Hart*

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400

1   Brian Schulman (016008)
    schulmanb@ballardspahr.com
2   Michael S. Myers (029978)
    myersms@ballardspahr.com
3   BALLARD SPAHR LLP
    1 East Washington Street, Suite 2300
4   Phoenix, AZ 85004-2555
    Telephone:   602.798.5400
5   Facsimile:   602.798.5595

6   J. Matthew Donohue (Oregon 065742)
    matt.donohue@hklaw.com
7   Joseph L. Franco (Oregon 073913)
    joe.franco@hklaw.com
8   *Pro hac vice Application to be Submitted*
    HOLLAND & KNIGHT LLP
9   111 S.W. Fifth Avenue
    Portland, OR 97204
10  Telephone:   503.517.2941
    Facsimile:   503.241.8014
11  *Attorneys for Defendant*

12              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

13              **IN AND FOR THE COUNTY OF MARICOPA**

14

15  RAMON MARTIN, individually and on
    behalf of all others similarly situated,          CASE NO. CV2018-011335

16                          Plaintiff,               **STIPULATED ORDER EXTENDING
                                                     TIME TO RESPOND TO**
17          vs.                                      **COMPLAINT**

18  INSYS THERAPEUTICS, INC., a                      (Honorable Christopher Whitten)
    Delaware corporation,

19                          Defendant.

20

21          The Court having considered the Stipulation for Extension of Time to Respond to

22  Complaint filed by Defendant Insys Therapeutics, Inc. ("Defendant") and Plaintiff Ramon

23  Martin ("Plaintiff"), and good cause appearing,

24          IT IS ORDERED that the deadline for Defendant to respond to the Complaint in

25  this action is extended through November 7, 2018.

26          DATED this _____ day of _____, 2018.

27

28                                          _____
                                            Honorable Christopher Whitten
                                            Maricopa Superior Court Judge

DMWEST #18150806 v1

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: 602.798.5400